1

1          UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4

5                     - - -

6

7     STEVEN MATTHEW SLUSHER,       :

8            Plaintiff,             :

9        Vs.                        :   Case No. 1:08-CV-00273

10    DELHI TOWNSHIP, OHIO, et al.,:

11           Defendants.            :

12

13                    - - -

14

15        The deposition of **JOSEPH J. MACALUSO, JR.**, Witness

16    herein, taken as on Cross-Examination by the Plaintiff,

17    pursuant to the Federal Rules of Civil Procedure, notice

18    and agreement of counsel to take deposition at the office

19    of Schroeder, Maundrell, Barbiere & Powers, 11935 Mason

20    Road, Suite 110, Cincinnati, Ohio 45249 on Monday,

21    January 5th, 2009, 10:55 a.m. before Shandy Ehde, a court

22    reporter and Notary Public.

23

24

25

1    APPEARANCES:

2                    ON BEHALF OF THE PLAINTIFF:

3                        **ALPHONSE A. GERHARDSTEIN, ESQ.**

4                        **ANDREA L. REINO, ESQ.**

5                        Gerhardstein & Branch

6                        432 Walnut Street, Suite 400

7                        Cincinnati, Ohio 45202

8

9                    ON BEHALF OF THE DEFENDANTS:

10                       **LAWRENCE BARBIERE, ESQ.**

11                       Schroeder, Maundrell, Barbiere & Powers

12                       11935 Mason Road, Suite 110

13                       Cincinnati, Ohio 45202

14                                   -  -  -

15            It is stipulated by counsel for the respective

16    parties that the foregoing deposition may be taken at the

17    time and place stated pursuant to the Federal Rules of

18    Civil Procedure and notice and agreement of counsel to

19    take deposition, that proof of the official character and

20    qualification of the notary is waived; that the

21    deposition may be taken in stenotypy by Shandy Ehde, a

22    Notary Public in and for the State of Ohio and

23    transcribed by computer out of the presence of the

24    witness and submission to the witness for examination and

25    signature was required.

3

```
1                          EXHIBIT INDEX

2     PLAINTIFF'S EXHIBIT NO.                        PAGE NO.

3     10  Printed Court Notification ................. 67

4     11  Employee Evaluation Form of Ronald L. Supe ..  70

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    JOSEPH J. MACALUSO, JR.

2    Witness herein, being first duly sworn as hereinafter

3    certified, was examined and deposed as follows:

4                        CROSS-EXAMINATION

5    BY MS. REINO:

6            Q.    I'm Andrea Reino.  I represent the

7    plaintiff, Matt Slusher, in this case along with Al

8    Gerhardstein.  Have you given depositions before?

9            A.    I have not.

10           Q.    Okay.  The basic ground rules are we try

11   not to talk over one another and try not to use gestures

12   or say uh-huh or uh-huh because later on we'll argue

13   about what that means in the transcript.  If you need a

14   break, let me know and if my questions are confusing,

15   please stop me and I'll repeat the question.

16           A.    Okay.

17           Q.    Can you just state your name for the

18   record?

19           A.    Joseph J. Macaluso, Jr.

20           Q.    And what's your business address?

21           A.    934 Neeb, N-e-e-b, Road, Cincinnati, Ohio

22   45233.

23           Q.    Are you currently employed by the Delhi

24   Police Department?

25           A.    I am.

1          Q.    How long have you been there?

2          A.    For 15 years.

3          Q.    What did you do before you were working for

4    Delhi?

5          A.    Before Delhi Township Police Department, I

6    worked for my father in the private sector.

7          Q.    What kind of business was that?

8          A.    A jewelry wholesale supply house.

9          Q.    And when did you become a police officer,

10   what year?

11         A.    1994.

12         Q.    Can you just briefly describe your

13   education, high school up through your highest level?

14         A.    I went to Oak Hills High School, graduated

15   in 1987, and I went to Cincinnati Tech, I guess is what

16   it's called, and I have a criminal justice degree,

17   associate degree in criminal justice that I received in,

18   I believe, 1996.  I also attended some courses at

19   Cincinnati, University of Cincinnati as well.

20         Q.    And where was the first law enforcement job

21   that you had?

22         A.    Delhi Township police deputy is my first

23   law enforcement full-time job.  I worked in Kentucky

24   literally one day at like Burlington's sheriff's office

25   in the jail when I was younger and I just didn't like

6

1    what they were doing and I just decided it wasn't for me.

2          Q.    Were you planning on being a corrections

3    officer at that point?

4          A.    Well, my whole goal was originally to get

5    on as a road officer and I didn't know whether I was

6    going to do Kentucky or Ohio.  I got an opportunity from

7    a friend who was a professor and I went ahead and tried

8    that, didn't like it and I went back to school, et

9    cetera.

10          Q.    You started off as a patrol officer for

11    Delhi?

12          A.    I did.

13          Q.    How many years?

14          A.    How many years as patrol officer?

15          Q.    Right.

16          A.    I was a patrol officer from 1994 until

17    2003.

18          Q.    And then what happened in 2003?

19          A.    I became a corporal.

20          Q.    Okay.  What's your current rank?

21          A.    Lieutenant.

22          Q.    Okay.  Could you take me through that?  You

23    were a patrol officer?

24          A.    Correct.  I was a patrol officer up from

25    when I started, my hire date, until 2003.  In 2003 I was

1    promoted to a corporal, which is an assistant squad

2    leader, for lack of a better term.  I held that position

3    for, I believe, three years until 2006 when I was

4    promoted to a sergeant and then I was recently promoted

5    to lieutenant.

6              Q.    And would that have been in 2008, promotion

7    to lieutenant?

8              A.    That would have been in 2008, correct.

9    Take that back.  I'm thinking here.  Yes.  2008.

10              Q.    Last year?

11              A.    Yes.  Just in September.  I'm sorry.

12              Q.    Any military history?

13              A.    No.

14              Q.    Okay.  With Delhi, have you ever been a

15    trainer for the other officers?

16              A.    I've been a field training officer, yes,

17    FTO.

18              Q.    What does that mean?

19              A.    When a new recruit is hired, a new officer,

20    I should say, is hired, they spend a period time with a

21    field training officer, someone who is familiar with the

22    streets and policies of the township and is able to train

23    that officer to become a self sustained road officer.

24              Q.    How long have you been doing that?

25              A.    I don't do it anymore; however, I was a

1    field training officer for a number of years and trained

2    numerous officers.  How we work it is we would make a

3    28-day period with one field training officer, go to

4    another field training officer, go to another field

5    training officer and then come back to the original field

6    training officer and we would write daily reports on how

7    they did and then quarterly reports.

8             Q.    So you would be evaluating a new hire,

9    basically?

10            A.    Correct.  I wasn't part of the hiring

11   process but once they were hired on, we would write notes

12   and see if they are doing well, if they felt like they

13   were making it through their probationary period.

14            Q.    Are you a member of any associations?

15            A.    No.  As far as the -- I'm no longer --

16   well, I guess the FOP.  I take that back.  But I'm not a

17   part of their representation now that I'm a lieutenant

18   but I think it's Lodge 84.

19            Q.    Did you hold any leadership positions with

20   the FOP?

21            A.    No, I did not.

22            Q.    Right now who is your direct report?

23            A.    Who --

24            Q.    Who do you report to directly?

25            A.    Chief of police.

1          Q.    And you're one of how many lieutenants?

2          A.    One of three.

3          Q.    Who are the other two?

4          MR. BARBIERE:    Let her finish her

5     question.

6          A.    Darrell Haussler, H-a-u-s-s-l-e-r, and Jeff

7     Braun, B-r-a-u-n.

8          Q.    So you have supervisory responsibility over

9     some officers?

10          A.    I do.

11          Q.    How many?

12          A.    Right now it's just two.

13          Q.    Who are they?

14          A.    Bill Roberts and Byron, B-y-r-o-n, Hunt,

15     H-u-n-t.

16          Q.    And in 2007, September of 2007, who did you

17     supervise?

18          A.    At that time I was a sergeant and I

19     supervised the third shift, which would have included Ron

20     Supe, Brad Doerger, D-o-e-r-g-e-r.  I can't think of all

21     their names, probably six or seven officers that I was in

22     charge of at that time.

23          Q.    That was third shift.  What are the hours

24     for third shift?

25          A.    Hours are from 9:45 p.m. until 7:15 a.m.

1          Q.    Are you still on third shift?

2          A.    Am I now currently on third shift?  No.

3     I'm on day shift, Monday through Friday.

4          Q.    Did you review any documents today in

5     preparation for this?

6          A.    I did review documents that would be

7     provided to you.  I looked at my personnel file.

8          Q.    What else?

9          A.    I looked at the documents, again, that were

10    given to you all.  That's it.

11         Q.    You're referring to the discovery

12    documents?

13         A.    Yes.

14         Q.    Okay.  Did you talk to anybody other than

15    your lawyer in preparation for this deposition?

16         A.    I talked in general conversation with the

17    other officers about that we have a deposition coming up.

18    When my attorney contacted us, I was the point of contact

19    to send out the e-mails to the guys saying, listen, you

20    need to get back to the lawyer, make sure this works for

21    the 23rd, et cetera.  So I did have general conversations

22    with them about it.

23         Q.    And when you're referring to the other

24    guys, are you talking about the defendants?

25         A.    I'm sorry, yes.

1          Q.     Paul Neyer?

2          A.     Yes, I am.

3          Q.     Ronald Supe?

4          A.     Roberts, and at the time it was Chief Jim

5    Howarth, and then I was told later it was going to be

6    Chief John Coletta.

7          Q.     What about Bryan Weldele?

8          A.     I forgot about him.  Brian Weldele as well.

9          Q.     How do you pronounce that?

10         A.     Weldele.

11         Q.     Okay.  I just want to ask you some

12   background questions on 407 Elm Street.  Did you have

13   prior contact with 407 Elm Street before the night in

14   question, which was September 2nd, 2007?

15         A.     Yes.

16         Q.     And can you tell me what that contact was?

17         A.     We had calls for loud parties at that

18   residence.  We had calls for fight runs at that

19   residence.  We had calls for weapon runs at that

20   residence.

21         Q.     And when you say weapon runs, what kind of

22   calls were those?

23         A.     Calls for people with guns, fighting, and

24   also we had a call for maybe shots fired maybe one time

25   there.

1      Q.    Do you know when that was, the shots fired?

2      A.    No, I do not know specifically what date

3   that was.  Unfortunately it seemed like we had calls, if

4   not every weekend to that residence then every other for

5   the time being.

6      Q.    Is there someone who owns the house who's

7   associated with that house?

8      A.    I don't know who owns the house.  I know

9   there's a tenant, his name is Rob Wagner, that lived

10  there.  Whether he owns it or not, I'm not sure.

11     Q.    Does Rob Wagner have some criminal record,

12  that you're aware of?

13     A.    Not that I'm aware of.

14     Q.    Did you have any prior contact with Matt

15  King?

16     A.    You mean personally?

17     Q.    Yes.

18     A.    No.

19     Q.    What about Matthew Slusher?

20     A.    No.

21     Q.    Joey Folkert?

22     A.    No.

23     Q.    On, I guess it would be September 1st,

24  2007, you were on duty third shift, correct?

25     A.    Correct.

13

1      Q.    Can you explain to me how you first were

2    called to 407 Elm Street?

3      A.    Me personally?

4      Q.    Uh-huh.

5      A.    Okay.  We got a call for a fight and it

6    was, I believe, at 407 Elm or could have been at the

7    corner of Elm and Delhi Road.  I was one of three or four

8    officers that responded.  I happened to be on the road at

9    that point in time.  What I mean by that is some of my

10   responsibility is to do administrative work as well.  So

11   sometimes I'm back in the office and sometimes I'm on the

12   road.  I was on the road and I believe I was probably the

13   last car to show up.

14     Q.    Was anybody with you in the car?

15     A.    No.

16     Q.    Okay.  Who else was on the scene from the

17   Delhi Police Department when you arrived?

18     A.    Ron Supe, Brian Weldele and I believe Paul

19   Neyer.

20     Q.    How many cruisers were there?

21     A.    There would have been a total of four

22   cruisers.

23     Q.    So each officer had his own cruiser?

24     A.    Correct.

25     Q.    What happened when you got to the scene?

14

1          A.      When I arrived at the scene, Mr. Slusher

2    was already seated in the back of Officer Supe's cruiser.

3    Mr. King was standing away from the scene and there was

4    an officer talking to him, and I walked up to the other

5    officers, asked what was going on.  They told me,

6    explained to me what the situation was, and I just kind

7    of monitored the situation until everyone left.

8          Q.      Okay.  Who was the officer that talked to

9    you about what was going on?

10         A.      I don't remember whether it was Brian

11   Weldele or Paul Neyer or, quite frankly -- or Ron Supe.

12   I don't recall which of the three.  If I remember

13   correctly they were, like one was talking to Mr. King and

14   I believe the other two were talking to each other or

15   Mr. Ron Supe might have been writing out a citation.  So

16   I might have walked over to them, but I don't remember

17   specifically.

18         Q.      What did they tell you?

19         A.      Call for a fight, which I knew because

20   Hamilton County dispatched a fight run, and that they

21   were looking into what took place.  And Ron Supe told me

22   that Mr. Slusher was receiving a disorderly conduct

23   ticket for his actions when they got there.

24         Q.      Have you talked to Matt Slusher?

25         A.      I never talked to him once.

1          Q.    What about Matthew King?

2          A.    I didn't personally talk to him.  I was

3     there.  I walked over and listened to his version of the

4     events when one of the other officers was talking to him,

5     so I heard what he said.

6          Q.    What did Matt King say?

7          A.    Matt King told us he had received a call

8     from either his girlfriend or mother of his child and he

9     had come home because there was a loud party and there

10    were guys that were making a ruckus at the place.  He

11    came home, Mr. Slusher was in his yard.  He got into a

12    confrontation in the yard.  Mr. Slusher took a swing at

13    him, he missed and Mr. King said, I punched him one time.

14          At that point Mr. Slusher said he was going

15    to call the police and Matt King said, go ahead, I didn't

16    do anything wrong, and Mr. Slusher walked towards the

17    intersection of Delhi and Elm to wait for the police and

18    Mr. King said, I followed, I stood away and I want to

19    talk to you and tell you my version of the events.

20          Q.    Was there anybody else there other than the

21    officers you described, Matt King and Matt Slusher?

22          A.    The Joe -- the subject.  I don't know how

23    to pronounce his last name.  Flocker?

24          Q.    I think it's Folkert.

25          A.    He was there as well.  He was not near

1     Mr. King when we were talking.  He was somewhat near the

2     cruiser when Mr. Slusher was in the back of the cruiser.

3     He was just standing there.

4          Q.    Did you say anything to Joey Folkert?

5          A.    No.

6          Q.    Did you say anything to him?

7          A.    No.

8          Q.    Did you hear him say anything?

9          A.    No.

10         Q.    Was there anybody else there?

11         A.    Any other --

12         Q.    Any other person?

13         A.    Not that I can recall.

14         Q.    Okay.  So you said that Matt Slusher was

15     already in the cruiser when you arrived?

16         A.    Correct.

17         Q.    Whose cruiser was it?

18         A.    Officer Supe's.

19         Q.    Did you go to the cruiser?

20         A.    No.

21         Q.    Did you talk to --

22         A.    I'm sorry.

23         Q.    Go ahead.

24         A.    I walked over near the cruiser when he was

25     writing the citation, but did I open the door and talk to

17

1    Mr. Slusher?  No.

2              Q.    Have you talked to Officer Supe?

3              A.    Amongst whoever the two officers were

4    there, I believe Officer Supe was writing the citation

5    and one of the other officers was there, I had

6    conversations with them as to what was going on but I

7    don't recall which one it was that I was talking to.

8              Q.    What did they say to you and what did you

9    say to them?

10             A.    I don't recall.  I mean I don't recall

11   specifically what was said.  I think I said before that

12   when Officer Supe or I was advised that there was a

13   fight, they were investigating a fight and that

14   Mr. Slusher was going to receive a disorderly conduct

15   citation for his behavior after the incident and I said,

16   fine.  That's all I recall.  And I walked over toward Mr.

17   King to hear his version of what happened.

18             Q.    What was the basis for the disorderly

19   conduct charge for Matt Slusher?

20             A.    My understanding, okay -- I guess this is a

21   better question for Ron Supe but my understanding was

22   that he was screaming, yelling, flailing his arms,

23   yelling, "This is bullshit," and Officer Supe put him in

24   the back of the cruiser to kind of settle the situation

25   down, but that's all I know.

1          Q.    Was he handcuffed at the time?

2          A.    I later learned that he was handcuffed at

3    the time.  I didn't walk over to the cruiser to determine

4    whether he was handcuffed or not.

5          Q.    Okay.  What happened after that?

6          A.    After they did the investigation, after the

7    officers talked to Matt Slusher, after the officers

8    talked to Matt King, the determination was made that Matt

9    King was more the victim than Matt Slusher and Matt

10   Slusher was in the yard of Matt King, Matt King took a

11   swing at Mr. Slusher and Matt King punched him one time.

12   It was determined that if anyone was the victim, it would

13   be more Mr. King than it would be Mr. Slusher.

14          We asked Mr. King if he wanted to file a

15   report against Mr. Slusher.  He said he did not.  He

16   said, you know, this guy's -- he didn't want to file a

17   report and at the end we told Mr. Slusher there was going

18   to be no charges filed and with that Slusher and Mr. King

19   walked over and shook hands and parted and went their

20   separate ways.

21          Q.    They shook hands while you were there?

22          A.    They did shake hands while I was there.

23          Q.    So at some point in time Mr. Slusher left

24   the cruiser?

25          A.    Yes.

1        Q.    What happened?

2        A.    One of the officers got him out of the back

3    of the cruiser, walked him over to Mr. King and I guess

4    at that point is when they told him, this is what we

5    feel, we feel based upon our investigation that this is

6    more of a situation where you were the aggressor, not the

7    victim, and he's choosing not to file charges against

8    you, and they shook hands.  I guess it was kind of one of

9    those no hard feelings, they shook hands and parted.

10        Q.    Did Matt King say anything?

11        A.    That I can recall, no.

12        Q.    What about Matt Slusher?

13        A.    As far as when they shook hands?

14        Q.    That's right.

15        A.    I don't know.

16        Q.    So Matt Slusher was not handcuffed at the

17    time?

18        A.    When he shook hands, no.

19        Q.    Okay.  And you were talking about the

20    determination that Matt Slusher was at fault.  What were

21    the factors that led I guess Ronald Supe to believe that

22    Matt Slusher wasn't at fault?

23        A.    Again, you'd probably have to ask Ron Supe

24    that.  I can tell you what they told me, which is what I

25    said before, that Matt Slusher came onto the property of

1    Matt King, he was raising his voice, ranting and raving,

2    he was confronted by Matt King, told him to settle down,

3    Matt Slusher took a swing at him, Matt King ducked and

4    Matt King punched him in the face, based on that but that

5    was my understanding later.  So as far as that goes,

6    that's all I can tell you.

7         Q.    Was your understanding that Matt Slusher

8    landed any punch or any physical injury on Matt King?

9         A.    My understanding was, no, he did not.  He

10   took a swing but he missed.

11        Q.    Did Matt Slusher suffer any injury?

12        A.    None that we noted that night.  None that I

13   noted because, again, when I saw him he was shaking hands

14   with him and parted ways.  I didn't see anything.

15        Q.    You were able to observe his face?

16        A.    Yes.  I didn't specifically look at his

17   face to look for any type of injuries but I was there

18   when they shook hands.  I didn't see anything grossly

19   obvious.

20        Q.    Did you hear him talk, Matt Slusher talk at

21   all?

22        A.    Not that I can recall.

23        Q.    Did you see any blood?

24        A.    No.

25        Q.    Okay.  After they shook hands, what

1    happened after that?

2          A.    From what I can recall, he started walking

3    home and then within a short period of time,

4    Mr. Slusher's father pulled up looking for his son and

5    wanting to know what was going on.  So I took

6    Mr. Slusher, Sr. aside and I spoke with him about what

7    took place to the best of my knowledge.

8                Mr. Slusher, Sr. at first was upset,

9    thinking that his son was the victim of an assault,

10   wanted to know why we weren't doing anything with it.  I

11   explained to him that we had been, had contact with the

12   son three or four times that night, he was told numerous

13   times to leave and came back.  I told him the version of

14   events; Mr. King advised he came back onto the property,

15   he swung at Mr. King and that Mr. King did punch him only

16   one time.  It wasn't like he attacked him.  We thought,

17   based on the totality of everything, that Mr. Slusher was

18   more of the aggressor than Mr. King was and therefore was

19   not the person that would be a victim of an assault but

20   more the aggressor of the assault.

21                Once we had conversation about that, he

22   accepted it.  He said, okay, I understand, it's a

23   diversion or something to that effect.  That was it, he

24   left.  Somebody may have brought him back and they left

25   together, but that was it for all intents and purposes.

1          Q.    How long from the time Matt Slusher started

2    walking home and the time you saw Steve Slusher?

3          A.    I would say minutes, but I don't remember

4    exactly how long.  I was still at the scene.  The scene

5    wasn't completely cleared when he pulled up.

6          Q.    When you say not completely cleared, what

7    are you referring to?

8          A.    Generally when we clear a scene, that means

9    all the investigation is completed and that all parties

10   are either sent on their way or, you know, if there's an

11   ambulance that's necessary, the ambulance has taken the

12   person.  The scene is secure and everyone leaves, that's

13   when we consider clearing a scene or going available from

14   the scene.  So we were still there.  Whether we were

15   having general conversation, whether we were getting

16   ready to leave, I don't recall but I do recall his father

17   pulled up, so I said I would talk to him.

18         Q.    And if we go back in time when Matt Slusher

19   was shaking hands with Matt King, was Joey Folkert still

20   around?

21         A.    I don't know.

22         Q.    Did you ever talk to Joey?

23         A.    No.

24         Q.    You told Steve Slusher we had three to four

25   contacts with Matt?

1          A.      That "we"?

2          Q.      That the Delhi Police Department had three

3     to four contacts.

4          A.      To the best of my recollection.

5          Q.      Who briefed you on the other contacts with

6     Matt Slusher?

7          A.      I don't recall.  I mean I don't recall who

8     told me that they dealt with him several times.  I don't

9     remember.

10         Q.      Now what kind of contacts were they

11    referring to?

12         A.      You would have to ask them.  My

13    understanding is there were three or four times for

14    either a -- loud party runs, I think there was one maybe

15    for a gun run where somebody made mention of a gun and

16    some fight run.  And Mr. Slusher to my knowledge was

17    present each time these calls were there but I didn't

18    make any of those calls.  I wasn't there for any of those

19    calls except for the final call.

20         Q.      Final call being the disorderly conduct?

21         A.      I apologize.  The final call being the

22    disorderly conduct.  I know we were called one other time

23    after that and I didn't go to that, either.

24         Q.      So you talked to Steve Slusher.  You

25    mentioned someone else being present with Steve.  Do you

1    know who that was?

2                    MR. BARBIERE:   I want to make sure

3            we're clear on the record.  I get the names

4            confused.  Steven is the father and the son

5            is Matthew?

6                    MS. REINO:   Correct.  When I refer to

7            Matt, we are referring to Steven Matthew

8            Slusher, the son.

9            A.    What was your question?

10                   MR. BARBIERE:   I get confused.  I

11           wanted to make sure the record isn't

12           confused.

13                   MS. REINO:   That's true.

14           Q.    My question was, who else was with Steve

15    Slusher when you talked to him?

16           A.    The father, correct?

17           Q.    Correct.

18           A.    No one, he was by himself.

19           Q.    Did he drive up in a car?

20           A.    Uh-huh.  (Witness nodded.)

21                   MR. BARBIERE:   Yes?

22                   THE WITNESS:   Yes.

23           A.    I'm sorry.  Yes.

24           Q.    And Matt Slusher was where at that time?

25           A.    I don't recall.  My understanding was he

25

1    was walking home, and that's all I know.  I don't know.

2    I just walked up and started talking to Mr. Slusher, Sr.

3    when he exited the car.

4         Q.    At that time did you know that Matt Slusher

5    had been cited for disorderly conduct?

6         A.    I did.

7         Q.    And who gave him the citation?

8         A.    Ron Supe.

9         Q.    Was that something that you had to approve?

10        A.    No, I did not.

11        Q.    Okay.  Did he talk about that with you, the

12   reason for the charges?

13        A.    He doesn't have to talk to me for the

14   reasons for the charges on disorderly conduct.  None of

15   the officers have to confirm with a supervisor before

16   making a determination.  So, no, I didn't talk to him

17   about it.

18        Q.    Approximately how long was your

19   conversation with the father, Steve Slusher?

20        A.    Five minutes.

21        Q.    And what did he tell you?

22        A.    What did Mr. Slusher tell me?

23        Q.    Yes.

24        A.    He didn't really tell me too much.  I more

25   or less told him what was going on.  I think his

26

1   questioning was, where's my son or why isn't my son a

2   victim of an assault and I explained to him.

3           Q.   And the reason that Matt Slusher was not

4   the victim of the assault, what were those reasons?

5           A.   Again, you probably would have to talk to

6   Ron Supe because they're the ones that did the

7   investigation but my understanding is the reason he

8   wasn't was because he was the primary aggressor.

9                MR. BARBIERE:   Plus the other reasons

10               he gave the first couple times you asked the

11               question.

12          Q.   Okay.  What happened after that?

13          A.   After Mr. Slusher left, then the scene was

14   cleared, we left the scene and I went back to either

15   routine patrol and eventually made my way back to the

16   station for paperwork.

17          Q.   Do you have any other contact with Matthew

18   Slusher or Steven Slusher that night?

19          A.   No.

20          Q.   Were you aware at the time that Supe and

21   Neyer were called to the scene of a theft from, or of an

22   auto?

23          A.   I was later.  When dispatch came out, I was

24   aware of it, yes.

25          Q.   Okay.  You were aware of it on September

1    2nd, 2007?

2         A.    I was.

3         Q.    But you didn't respond to that scene?

4         A.    I did not, no.

5         Q.    Okay.  So you were aware of it from the

6    dispatch.  Did you have any opportunity to talk to either

7    Officer Neyer or Officer Supe after the fact?

8         A.    I did.

9         Q.    And what did they say to you and what did

10   you say to them?

11        A.    Officer Supe called me and said, hey, this

12   is going to be the same subject that's going to be Matt

13   Slusher's vehicle that has been apparently broken into

14   over on Wilke.  And I said, okay.  He said, what do you

15   think we have here?  I said, well, something to the

16   effect for all intents and purposes it looks like an auto

17   theft and recovery and then theft from auto.  I

18   instructed him to take a report.

19              Keep in mind that when we do an auto theft,

20   we have to enter it into the system as a stolen auto but

21   it's already been recovered.  It was recovered in our

22   jurisdiction so there was no clerical or administrative

23   paperwork that needed to be generated at this point.  It

24   was moved from point A to point B and there was a theft

25   from the vehicle.  So we took the report and I

28

1    specifically remember telling him to note down in your

2    supplement if we find this suspect responsible for this,

3    we'll have to revisit the idea of an auto theft as well.

4    That was probably all of our conversation and I went back

5    to doing my paperwork and he took the report.

6             Q.    So that would have been a cell phone

7    conversation?

8             A.    Correct.

9             Q.    Did you talk to Officer Neyer?

10            A.    No, not that I can recall.

11            Q.    Did Officer Supe talk about whether or not

12   there were any suspects?

13            A.    Not during our conversation, that I can

14   recall.

15            Q.    Okay.  What was the next thing that you

16   remember about the auto theft?  Did you have another

17   conversation with Officer Supe?

18            A.    Did I about the auto theft?

19            Q.    Yes.

20            A.    Not that I can recall.

21            Q.    Did you ever review any paperwork from

22   Officer Supe related to the auto theft?

23            A.    I have to review -- One of my

24   responsibilities is to review paperwork and insure that

25   it's proper and correct and send it through.  So, yes, I

1    did.

2         Q.    And when we're talking about the paperwork,

3    are you talking about the supplement or narrative or an

4    incident report?

5         A.    Well, anytime any paperwork is generated

6    through the shift, the responsibility of the sergeant,

7    the corporal or any officer in charge would be to check

8    that paperwork, which means if there's an NIBRS report

9    written, make sure there's no errors in there, that

10   everything looks correct and accurate.  What I mean by

11   errors, spelling errors, could be they have the wrong

12   section for theft versus criminal damaging.

13             Not that we don't make mistakes and miss

14   some things but generally I need to do a check-over.  If

15   there's an NTA, Notice To Appear, I look at that.  A lot

16   of times, I'm a notary, I'll notarize it.  If there's a

17   supplement in there, I will briefly look at the

18   supplement.  Depends on the type of paperwork generated

19   throughout the shift.

20             My responsibility is to check it and pass

21   it on to clerical.

22         Q.    So you would be checking it during the same

23   shift that the incident occurs usually?

24         A.    Generally, but if the incident occurs at

25   6:30 in the morning and we get off at 7:15 and he or she

1    doesn't have the complete report done, then the next

2    night I come in to work, I look at it.  A lot of times

3    it's done at the end of their shift and I check it in.

4    Just depends.

5              Q.    So in this case would you have reviewed the

6    disorderly conduct paperwork on the same night?

7              A.    More than likely.  I can't say with one

8    hundred percent certainty.  More than likely I check the

9    paperwork in, notarize it and send it through that night.

10             Q.    What about the disorderly, the theft from

11   the auto?

12             A.    More than likely, just because it happened

13   at 3:00 or 4:00 in the morning and I don't get off until

14   7:15 in the morning, more than likely.  If you look at

15   the NIBRS report, I'll put my initials down there and the

16   date.  If the initials and date are the same as the night

17   it was generated, then it would probably be the same

18   night.  Sometimes the report will be written on 9/2/07

19   and I will review it on 9/3/07.  So I would mark that on

20   there, the date I reviewed it.

21             Q.    Do you ever make any suggestions about

22   changes to the report rather than clerical error or

23   spelling?

24             A.    As far as changes, as far as I don't agree

25   with what you cited somebody with or I don't agree with

1    what the report that's taken, if there is a glaring error

2    that needs to be addressed, yes, I would get involved

3    with that.  If somebody wrote somebody an assured cleared

4    distance ahead citation when it didn't rise to that

5    level, again, I would assume I did some investigation on

6    that and then say, hey, this doesn't look like it fits

7    but there was nothing that stuck out in my head with this

8    disorderly conduct ticket.

9            Q.    So were you aware of the theft of auto --

10   we talked about that.  Did you have any responsibility

11   towards investigating the theft of or the theft from Matt

12   Slusher's car?

13           A.    No.  That's not my responsibility.

14           Q.    Did you assign any investigator or officer

15   to look into that?

16           A.    That's not my responsibility.

17           Q.    Who would have made that assignment?

18           A.    At the time it would have been lieutenant

19   in charge of investigations which is currently the job I

20   hold now.  So now I do that.  At the time they pass on

21   the paperwork to clerical.  They make a photocopy of the

22   report to give to investigations.  The investigations

23   lieutenant takes that report and he assigns it to one of

24   the investigators to look into.  So Lieutenant Howarth,

25   who is now the chief of police, handled that, would have

1    been the person at the time that would have assigned that

2    to Detective Roberts and that would have been, probably

3    been the next business day or probably within the next

4    couple of days.

5         Q.    How would Lieutenant Howarth been aware of

6    the fact there was a theft from this car or of the car?

7         A.    Two things.  One, the shift briefing.  We

8    do a shift briefing at the end of the night and just kind

9    of do a synopsis of everything that took place.  He would

10   have been made aware of it that way.  But the best way is

11   the copy of the report would have gone into an

12   investigator bin.  All copies of reports go into that

13   bin.  So the investigative lieutenant takes them out of

14   the bin, looks them over and assigns them to whatever

15   detective he wants to assign them to, himself included.

16   This one obviously went to Detective Roberts.

17        Q.    The document in the investigative bin, is

18   that the supplement report or an NTA?

19        A.    The reports that go into the investigator's

20   bin are photocopies of the NIBRS report.  The NTA doesn't

21   go into the investigator's bin because there's no active

22   investigation on an NTA, it's been issued and written.

23   The only time investigators would is if -- but not minor

24   misdemeanor.  But if there was a charge on that

25   individual and they were looking into locating that

1    individual, they would be given a copy of it.  Normal

2    DUI, Notice To Appear, disorderly conduct, those don't go

3    to the investigator because the arrest has already been

4    effected.  In this case it would have strictly been the

5    theft.

6           Q.   So you were talking about Officer Supe

7    describing to you the situation and you discussed it with

8    him.  He created a report.  When was the next

9    conversation you had with Supe about the situation with

10   Matt Slusher?

11          MR. BARBIERE:   You mean the theft or

12          anything?

13          Q.   The theft or disorderly conduct.

14          A.   I couldn't tell you.  I mean, I don't know.

15   He generated the report, it got turned in, passed in.

16   That was probably the end of it.

17          Q.   You were supervising Detective Roberts at

18   that time in 2007?

19          A.   No.

20          Q.   No?

21          A.   My only responsibility as a sergeant is the

22   road patrol, which I had about six or seven people that I

23   was in charge of.  The investigator is off on a different

24   person.  That's on the investigative lieutenant and that

25   person, he would have two or three people.  Now currently

1    I have Bill Roberts but at the time I did not.

2        Q.    Not in 2007?

3        A.    Not in 2007.  I was a road sergeant.  Now

4    I'm investigative lieutenant.

5                        (Short recess.)

6        Q.    Going back to when you first arrived at the

7    scene, you talked about Matt Slusher being in the back of

8    Officer Supe's cruiser, right?

9        A.    Correct.

10       Q.    And you didn't say anything to Matt Slusher

11   at that time?

12       A.    I did not.

13       Q.    He was handcuffed?

14       A.    I don't -- I didn't check.  I didn't open

15   the door.  My understanding later was that he was

16   handcuffed for a period of time.

17       Q.    He was under arrest at that time?

18       A.    He was detained.  Again, these are

19   questions probably better suited for Ron Supe; however,

20   my understanding was that he was acting turbulent,

21   yelling, screaming, flailing and they put him in the back

22   of the car to settle him down.  My understanding was that

23   the possibility of M4 disorderly conduct was being tossed

24   around but they chose to do a minor misdemeanor and

25   released him with a citation.

1          Q.    They chose?

2          A.    I guess that would be Officer Supe.

3          Q.    Now what's the difference between M4

4     misdemeanor and the disorderly conduct he actually

5     received?

6          A.    Minor misdemeanor is a payout citation and

7     misdemeanor fourth degree technically would hold jail

8     time for persistent behavior.

9          Q.    Did you ask Officer Supe or Officer Neyer

10    about the reason that they thought he was acting

11    turbulent?

12         A.    I did not.

13         Q.    Did they talk to you about alcohol or drugs

14    being a factor?

15         A.    No.  I don't recall.

16         Q.    Did you see or smell any alcohol on Matt

17    Slusher's breath?

18         A.    No, I did not.

19         Q.    Did Officer Supe tell you the history of

20    what had gone on at 407 Elm Street on September 2nd,

21    2007?

22         A.    At the time?

23         Q.    At the time that you were there.

24         A.    At the time I don't recall any specific

25    conversations, but it was my understanding that we were

1    there several times and that he was there every time or

2    just about every time.  What specifically was said, I

3    don't recall.

4            Q.    So that night, I'm talking about September

5    2nd, you learned there were several contacts with 407 Elm

6    Street?

7            A.    I did.

8            Q.    Did you learn that there were certain

9    contacts with Matt Slusher besides the one that you

10   arrived at the scene for?

11           A.    I did eventually learn that he was, he was

12   there and asked to leave on several different occasions.

13           Q.    Did you know that on September 2nd, 2007 or

14   was that after that you found that out?

15           A.    I knew on September 2nd but whether I knew

16   it specifically when I got out of the cruiser, no, I did

17   not.  At some point during the evening I had learned that

18   Mr. Slusher was there and was told to leave numerous

19   times.

20           Q.    And did you get any background on why Matt

21   Slusher was there at 407 Elm Street?

22           A.    Did I get any background at the time I

23   pulled up?

24           Q.    That's right.

25           A.    No, I did not get any background as to why.

1    I later found out that he had came back for his keys but,

2    again, when I pulled up, I didn't know why he was back at

3    the house.

4            Q.    So you didn't know when you first pulled up

5    but subsequent to that, before you talked to Steve

6    Slusher, did you find out why Matt Slusher was at the

7    house?

8            A.    Yes.  I don't recall specifically somebody

9    saying something, but I do recall that I knew that he was

10   at the house and that his reasoning for being at the

11   house was to get his buddy's glasses and his keys.

12           Q.    Did you see any car parked in the driveway

13   of 407 Elm Street?

14           A.    Not that I can recall.

15           Q.    Had you ever been on any runs to 407 Elm

16   Street yourself?

17           A.    I have.

18           Q.    What for?

19           A.    Disorderly conduct once, loud parties,

20   fights in the street, shots fired once.

21           Q.    What kind of house is it, single-family

22   or --

23           A.    It's a two-family-style house.

24           Q.    Who lived on the top part of the building?

25           A.    I don't know who -- well, Rob Wagner lived

1    there.  Now whether he lived on the top or bottom floor,

2    I don't recall.

3        Q.    What about Matt King, do you know where he

4    lived?

5        A.    He lived in the other portion of it.  But

6    when he moved in, I don't recall.

7        Q.    Had you ever been called to 407 Elm Street

8    for Matt King for any reason?

9        A.    Me personally?

10       Q.    Yes.

11       A.    No, not that I can recall.

12       Q.    So you were describing a conversation that

13   you had with Steven Slusher.

14       A.    Okay.

15       Q.    Where was the conversation?  Where did it

16   take place?

17       A.    It would have been very close to the

18   intersection of Delhi and Elm, in a parking lot.  I don't

19   know what business parking lot it was at but it was just

20   in a parking lot.  He pulled off to the side and talked.

21       Q.    What did you tell him about his son?

22       A.    To the best of my recollection I said to

23   him that his son received a citation for disorderly

24   conduct because of his behavior after we arrived on the

25   scene.  To the best of my recollection he asked about why

1    his son wasn't, you know, why this other guy wasn't

2    arrested for assault.  And I advised him that it was

3    because through our investigation we determined that his

4    son was actually the primary aggressor and I explained

5    the circumstances and he understood and said okay.

6          Q.    Did you talk to Steve Slusher about any of

7    the other contacts that Matt Slusher had with the police

8    that night?

9          A.    To the best of my recollection I told him

10   that we had dealt with his son a few different times

11   during the night and he was told to leave a few different

12   times.  But specifically, you know, what he did or what

13   he said, no, I don't recall if I said that at all.  I

14   don't recall.

15         Q.    Okay.  Let's just look at some of these

16   blotter reports that we had referred to earlier.

17               The first one we have here marked as

18   Exhibit 1, go ahead and review that and tell me when

19   you're done.

20         A.    Okay.  (Witness complied.)  I'm done.

21         Q.    We're talking about that was at 1:30 a.m.,

22   1:34 a.m.?

23         A.    Correct.

24         Q.    Was that something you would have been

25   aware of at the time that there was a call and unit

1    dispatched to 407 Elm Street?

2            A.    Any dispatched call that comes out over the

3    CAD system, which is the Hamilton County communications

4    system, I would be aware only because I have a radio and

5    I would have heard it as well.  So, yes, I would have

6    been advised there was an anonymous complaint of some

7    trouble and mention of a gun.

8            Q.    So you would have heard that over the

9    radio?

10            A.    Yes.

11            Q.    Did you have any communications with any of

12    the officers about the anonymous complaint?

13            A.    No.

14            Q.    Did you ever find out the results of that

15    run to 407 Elm Street?

16            A.    Well, it would have been put down in what

17    we call a blotter or a green and I would either have

18    typed it into the computer at the end of my shift, or the

19    clerical staff.  That's the only way I would have known

20    about it.  As a supervisor, I don't go to every single

21    call that gets dispatched out.  They get dispatched to

22    fight runs that I don't necessarily have to go to, theft

23    report runs, et cetera.  If I'm out on the road and it's

24    a pressing call, I may respond to it.  It's at my

25    discretion.

41

1          Q.    Do you have any present recollection of

2    typing that report?

3          A.    I do not.

4          Q.    So the second blotter report that we have

5    would be what was previously marked as Exhibit 2.  This

6    is the call we were just talking about with the

7    disorderly conduct.  Just take a look at that for me.

8          A.    Okay.  (Witness complied.)

9          Q.    Let me know when you're done.

10         A.    I'm finished.

11         Q.    Okay.  So under complainant is listed Matt

12   King.  Who would have made that determination and entered

13   Matt King on the blotter?

14         A.    Whoever wrote out that particular blotter

15   and, generally speaking, the person that issued in this

16   case the citation would have wrote out that blotter.  So

17   that would be Ron Supe.  As far as why he -- you have to

18   keep in mind just because you call the police doesn't

19   always make you the complainant.  The CAD system will

20   generate whatever calls is being the complainant but our

21   investigation may reveal in fact they're more of a

22   witness and we actually locate the complainant and we put

23   the complainant on there.

24              We've had times where a person calls, is

25   listed as complainant and they ended up being the suspect

42

1    or arrested party.  When it comes down to the final

2    blotter complainant, we write down who the complainant

3    would be and the cited person would be for this

4    particular blotter.

5         Q.    So when you got to the scene that night,

6    did you know who made the telephone call?

7         A.    I don't recall who made the telephone call.

8    It may have been on dispatch who called but I don't

9    recall who it was.

10        Q.    So that would be up to the dispatch, the

11   Cincinnati --

12        A.    Hamilton County regional.  Well, Hamilton

13   County communication center.  A typical radio run might

14   be something to the effect of, see complainant reference,

15   an assault, and they code it in based on what the person

16   tells them.  So sometimes we'll get it as an assault and

17   in actuality it's an abduction.  You know, it can change.

18             But based on what they're hearing, they'll

19   code it in that way.  That doesn't necessarily mean when

20   we put it in our blotter it has to be put in that way.

21   We do an investigation.  If it's an auto accident, we get

22   dispatched to auto accident and we find out it was a

23   lover's quarrel and it was more of a criminal damaging,

24   then we would change that.  In this particular case it

25   is -- I believe -- well, I'm not sure who called the

43

1    police.  I'm not sure who called the police.

2            Q.    Would the same information be available to

3    Officer Supe that was available to you about the dispatch

4    call?

5            A.    Yes.

6            Q.    Okay.  Let's look at Exhibit 3.  This is

7    the third blotter report.  Just let me know when you're

8    done looking at that.

9            A.    I'm ready.

10           Q.    Okay.  So that's the third contact, which

11   we haven't talked about that much, is the auto theft.  If

12   there was any other contact between Matt Slusher and 407

13   Elm and the police that night, would that have been

14   reflected on some sort of blotter report?

15           A.    The blotter report wouldn't necessarily

16   reflect that we had been there numerous times, if I'm

17   understanding your question correctly.  No.  This would

18   have specifically been for the theft report.  In this

19   case it was -- you know, the CAD came out and it was

20   generated to dispatch to the area of 437 Wilke,

21   W-i-l-k-e, Drive.  And when they got there, they made an

22   investigation and generated a NIBRS report for a theft.

23           Q.    So when you're talking to Steven Slusher

24   about the contacts that his son had with the police that

25   night, you could be talking about contacts that are not

44

1    reflected on the blotter report?

2          A.    Well, just looking at what you've given me

3    in Exhibit 1 and Exhibit 2, I'm showing three calls prior

4    to.

5                MR. BARBIERE:    This one here is --

6          A.    This is the same address.

7                MR. BARBIERE:    This one --

8                THE WITNESS:    I apologize.  Okay, this

9          is a different one.  Okay.

10         A.    I lost your question but as far as could

11   there be any other contacts with Mr. Slusher that were

12   not generated on a blotter, if that's your question, if

13   we specifically talk to somebody and they're the suspect

14   or the involved party or the complainant or witness to

15   something, we will document that.  If we respond to a

16   party run where there is, hypothetical, where there's 25

17   people there and we recognize one or two as being like,

18   didn't we warn him before and they run inside the house

19   or run there, we might not specifically list them.  I

20   don't know if that was the case because I wasn't there at

21   the other runs.  This particular one would have been a

22   separate theft report.

23         Q.    When you were talking to Steve Slusher,

24   were you aware that Matt Slusher had been sent away from

25   407 Elm Street by Officer Supe?

1          A.    I was advised that he was told to leave on

2     a couple different occasions, few different occasions

3     prior to coming back to the house and had the assault,

4     disorderly conduct situation occur.

5          Q.    Were you told why Matt Slusher was told to

6     leave the house?

7          A.    No.  I mean, I don't recall.

8          Q.    Do you remember any other incident with

9     Matt Slusher that night that you related to Steve Slusher

10    that you had heard from Officer Supe?

11         A.    Not that I can recall.

12         Q.    So if the police were dispatched to 407 Elm

13    Street, we can say that that would have been reflected on

14    a blotter report; is that accurate?

15         A.    Correct.  If we were dispatched to 407 Elm

16    Street, we would have a record of it, yes.

17         Q.    Approximately how long were you at the

18    scene at 407 Elm Street?

19         A.    For the disorderly conduct/assault

20    situation?

21         Q.    Right.

22         A.    A guess would be 15 minutes.  I'm guessing.

23    Maybe 20.

24         Q.    What was your next stop after 407 Elm

25    Street?

46

1          A.    I have no clue.  I mean after I left 407

2     Elm, I went back on the road and at some point made my

3     way into the station and did my paperwork.

4          Q.    At some point you had a conversation with

5     Officer Supe about the theft of the auto?

6          A.    That's correct.

7          Q.    You had mentioned it was actually a theft

8     and recovery of the vehicle?

9          A.    Yes.  Technically speaking if you move a

10    vehicle to another location, then that victim did not

11    move that vehicle, it would be considered a theft and

12    recovery.  Good example would be if it was stolen in the

13    City of Cincinnati and recovered in the Delhi Township,

14    that would generate more paperwork.  But this is a

15    situation where no entries need to be made because it was

16    found prior to being noticed it was gone and the recovery

17    was in the same jurisdiction where it was taken from.  So

18    what I knew we had for sure was, according to them, a

19    theft of an auto and recovery of an auto and theft from

20    auto and we generated a report on that.

21         Q.    Even though the auto was actually recovered

22    at the time, would you still investigate the theft of the

23    car?

24         A.    Certainly.  Certainly we would look into

25    the theft of the auto, come up with a viable suspect,

1    absolutely.  For insurance purposes -- well, I don't want

2    to speculate insurance.

3         Q.    I want you to look at the actual report

4    that Officer Supe wrote that night.  This is Exhibit 5.

5    You can go ahead and read that.

6         A.    Okay.  (Witness complied.)  Okay.

7         Q.    Starting with the very first paragraph

8    there, Officer Supe -- This is a memo by Officer Supe

9    talking about the theft of the car which was a Pontiac

10   Grand Prix, talks about the dashboard being removed and

11   stereo missing, officers have been in contact with Matt

12   Slusher four separate times prior to this call.

13             Now that is not accurate, right?

14             MR. BARBIERE:    I'm going to object.

15        Go ahead.  You can answer.

16        A.    I don't know.  If you're going to ask me

17   because the blotter doesn't show four different contacts

18   with him, I described earlier that maybe -- Again, you

19   have to ask this of Officer Supe, but maybe he made a run

20   or John by a routine patrol and saw him in the area, I

21   don't know.  But the blotter shows three times.  I guess

22   it could have been three, but that's a question you have

23   to ask Officer Supe.

24        Q.    If you look at Exhibit 1 and 2, those

25   blotter reports, both of those were prior to the car

48

1    theft, right?

2         A.    Correct.

3         Q.    So they would have been two documented

4    contacts according to the blotter?

5         A.    According to what I have here, right.

6         Q.    We have a sentence here that starts with,

7    "Matt stated that he had been at 407 Elm Street all

8    night ..."  Do you see that?  It's about halfway down in

9    the first paragraph.

10        A.    Give me one second.  Yes, I see it.

11        Q.    "... all night drinking and partying with

12   our local thugs, including Brad DeAngelo and Charles

13   Jones."

14        A.    Okay.

15        Q.    Do you know who Brad DeAngelo is?

16        A.    I do.

17        Q.    And he has some reputation?

18        A.    Brad DeAngelo has been involved with the

19   courts and law enforcement quite a bit.

20        Q.    What kind of reputation does he have?

21        A.    I believe he broke into a -- did a breaking

22   and entering of a gun shop.  He's been caught for

23   stealing from autos, stealing autos, just general bad

24   history.

25        Q.    What about this other person, Charles

1    Jones, did he have a reputation that you were aware of at

2    the time?

3          A.    He does.

4          Q.    What type of reputation?

5          A.    Same.  I actually caught him after he broke

6    into somebody's house in Green Township.

7          Q.    Was that prior to September 2nd, 2007?

8          A.    You know, I don't remember.  I'm trying to

9    think when that was.  I don't know if that was before

10   September 2nd or after.  Part of me wants to say after

11   but I don't know that for a fact.

12         Q.    This sentence he characterizes Matt Slusher

13   as having been drinking and partying with these two

14   individuals.  Was that something that you had learned

15   from Officer Supe before you went back to the station?

16         A.    No.  That he had been partying and drinking

17   with these two particular individuals?

18         Q.    Yes.

19         A.    No.

20         Q.    Did Officer Supe talk about the alcohol

21   consumption by Matt Slusher or anybody else at 407?

22         A.    Not to me, no.

23         Q.    If we move on here, he talks about Matt

24   leaving his car parked in the driveway, left the keys

25   with the occupants of the second floor because he was too

1    drunk to drive home.  Was that anything that Officer Supe

2    talked to you about before you left the scene?

3         A.    No.

4         Q.    When I say "something," I'm talking about

5    Matt Slusher being intoxicated or having anything to

6    drink?

7         A.    No.  No conversation about it with me.

8         Q.    The second paragraph, looks like the second

9    sentence starting with, "I discussed the incident with

10   Sgt. Macaluso and he advised that even though this

11   appears to be an auto theft/recovery we will carry this

12   as only a theft from auto."

13        Now what did you communicate to Officer

14   Supe about how you treat this incident?

15        A.    Again, part of our job is to do an

16   investigation and at the time -- Some investigations take

17   moments, some take months.  In this particular situation

18   he was called to the scene and he took a report.  Again,

19   questions -- he alleged to me that he felt that this was,

20   this was more than meets the eye, that this theft from

21   auto was possibly not that.  He felt like that where the

22   car was at and the likelihood of this individual driving

23   down this street and finding this car would not be that

24   likely.  But nonetheless it was what it was.  We had it

25   there and we had to take a report.

1          So what I told him to do was take a theft

2     report and we'll investigate, we'll look into it.  My

3     words were -- he even says in the last paragraph, we may

4     want to revisit the idea of the auto theft if in fact we

5     come up with a suspect in this case.  What report we took

6     and charged somebody are two different things.  If we

7     ended up finding out as an example that John Smith or

8     whatever took the car -- I'm just throwing that name out

9     as an example -- we could also look into, if it was a

10    stolen car, we could looking into maybe he stole that car

11    as well.  That was something for the investigator to look

12    into.

13          Q.    Why did Officer Supe tell you there was

14    more going on here than met the eye?

15          A.    You'll to have talk to Officer Supe about

16    that.  His story about hypothetically driving down the

17    street.  I shouldn't say hypothetically but driving down

18    the street and finding his car when that would not have

19    been the normal path that he felt that he would have gone

20    home that particular night.  I don't know.  That, coupled

21    with maybe a few other things.

22          These are questions you probably have to

23    ask him.  When he called me, he just told me he felt

24    there was more to it than just a theft of an auto.  He

25    wasn't even sure if he did this himself to his own car.

52

1    Regardless of that, I told him, we'll take a report for

2    it and let the investigators look into it, and that's

3    what we did.

4          Q.    You mentioned that where the car was it was

5    not likely that Matt Slusher walked past the car?

6          A.    Apparently his sister drove him past the

7    car, is my understanding.

8          Q.    What was Officer Supe's understanding of

9    where they were heading when they were driving past the

10   car?

11         A.    You would have to ask him that.  I don't

12   recall what he said but I mean -- I don't recall.  I

13   don't recall.  All I remember him saying is the

14   likelihood of him turning down Wilke Drive from where

15   they were coming from, and I don't recall exactly now

16   where they were coming from.

17         Q.    Which address was the car found at?

18         A.    Well, the address of the incident is 437

19   Wilke Drive.  That would probably be where the car would

20   be found.

21         Q.    You're referring to, I think, the blotter

22   report?

23         A.    Talking about Exhibit No. 3.  We are

24   apparently dispatched to 433.  So maybe he called from

25   somebody's house at 433 but according to the blotter,

53

1    437, between 433 and 437.  Whether the car was at 433

2    Wilke or 437 Wilke, I don't know but it was right in that

3    area.

4           Q.    How far is 433 or 437 Wilke from 407 Elm

5    Street?

6           A.    I guess a quarter mile or something like

7    that.  About a quarter mile.

8           Q.    He also -- I'm talking about Officer

9    Supe -- talks about it should be noted that the value of

10   the stereo was $10 and he's describing his own property,

11   right, in the second paragraph?

12          A.    Right.

13          Q.    Do you have a present recollection of

14   having a conversation about possible stolen property with

15   Officer Supe?

16          A.    I don't recall a conversation.  I see what

17   he's written now but I don't believe the conversation was

18   whether the property was stolen or not.

19          Q.    Okay.  So at the time you don't recall

20   having the conversation?

21          A.    No.  And to this day I don't believe I had

22   a conversation with him about that.  He might have

23   written it in the supplement but we didn't sit down and

24   discuss it, that I'm aware of.

25          Q.    When would you have reviewed the supplement

54

1    that we're looking at, which is Exhibit 5?

2        A.    The same time I would have reviewed the

3    NIBRS report, which would have been either that night or

4    the next day.

5        Q.    Did you do any follow-up with Officer Supe

6    about this report?

7        A.    No.

8        Q.    Do you know whether you followed up at all

9    about the allegation there was stolen property in the

10   car?

11       A.    Stolen property in the car?

12       Q.    Yes.

13       A.    That's the first I heard of property stolen

14   in the car.  Property stolen in the car?  No.  Again

15   officer's responsibility would be to take the initial

16   report and write up a supplement and then the

17   investigator would look into that.  But as far as there

18   being stolen property in the car, I mean that's obviously

19   something that we would probably have to investigate at

20   the time and not later because that property could be

21   removed.  But I don't know of any stolen property being

22   in the car.

23       Q.    So I'm still back on the second paragraph

24   here where he talks about stolen property, Officer Supe

25   says that Matt's story was fishy, Matt Slusher's story

55

1    was fishy.  Did you have any conversations with him about

2    why he was doubting the veracity of Matt Slusher's story?

3         A.    Not that I can recall.  I remember him

4    calling me and I remember him telling me that he felt

5    there was more to the story than just a theft of an auto

6    or theft from an auto.  He felt that how Matt Slusher

7    came about his car on Wilke Drive when it wouldn't be a

8    normally traveled roadway to get to and I don't know

9    their destination now but at the time I remember he said

10   the destination, he just felt there was something

11   suspicious about that, but specifically what he concluded

12   as fishy, you'll have to ask him.

13        Q.    He mentions that Matt Slusher said the

14   owner, who he characterizes as the owner of 407 Elm

15   Street, Rob Wagner, expressed displeasure with him for

16   bringing police around his house tonight.  That was the

17   very last sentence.  Do you see that?

18        A.    Yes.

19        Q.    Do you agree that that would be a motive

20   for Rob Wagner to have stolen the car or --

21        A.    I don't know.

22             MR. BARBIERE:   Objection.

23        A.    I don't know.

24        Q.    We were talking about perhaps revisiting

25   this issue if a suspect was identified?

56

1          A.    Yes.

2          Q.    Is it your understanding there was no

3     suspects at that time?

4          A.    At that time there was no suspects in

5     particular.  I believe at the time he's probably

6     suspecting everyone that was at that house at one point

7     in time during the night but no one stood out that he

8     mentioned, that I'm aware of.

9          Q.    So the suspects would have been the people

10    at the house?

11         A.    I would have to assume his keys were in the

12    house unless he left another set of keys in the car.  I

13    have to assume that's what his thoughts were, but that's,

14    again, something he would have to tell you or Officer

15    Supe tell you.  If that's what he said, I don't know.

16         Q.    Would it be reasonable for Officer Supe to

17    have interviewed anybody inside that house?

18         A.    That night?  Sure it would have been

19    reasonable.

20         Q.    He also mentions fingerprinting the car?

21         A.    Okay.

22         Q.    That the fingerprinting could have been

23    done on the trunk -- the driver and passenger door

24    handles, I guess, and the trunk.  Was there any other

25    area of that car that you think they could have obtained

57

1    prints from?

2             A.    I don't know.  I know that the

3    investigator, Bill Roberts, went and did process the car

4    the very next day.  We did send an investigator out

5    there.  Whether they were faulty prints or not, I guess

6    that's something you need to get with Detective Roberts

7    on.  We did do that.  Whether anything else could have

8    been printed, I wasn't there, I don't know.  I wasn't

9    there.

10            Q.    You mentioned you would have reviewed this

11   either the night of or day after?

12            A.    Right.

13            Q.    You would not have had any responsibility

14   for assigning follow-up to this report?

15            A.    No, ma'am.  My responsibility is not to

16   assign to the investigator, my responsibility is to check

17   in the original report, and that original report goes up

18   to clerical from there.  They do whatever they do with it

19   up there.  What happens is the officer who writes that

20   report will make a photocopy of the NIBRS, which you have

21   right there, and a copy of his supplement.  He will then

22   staple it or paper clip it and put it in the

23   investigator's IN bin.

24            Now it becomes the investigator's

25   supervisor's responsibility to pick up all those reports

58

1    out of a that bin and read them and assign them to

2    whatever detective he wants to assign them to, himself or

3    another investigator.

4              We have 29 officers or so, relatively

5    small.  We have currently three investigators so it would

6    have been Bill Roberts got it, it would have been Byron

7    Hunt or at the time Jim Howarth.  So he chose to give it

8    to Bob -- I'm sorry, to Bill Roberts.

9         Q.   And what was the next conversation you had

10   about the Matt Slusher event?

11        A.   I think the next conversation I probably

12   have is when I found out we were being sued.

13        Q.   So you didn't have any role in the

14   investigation of the auto theft?

15        A.   No.

16        Q.   If we go back to the initial scene that you

17   responded to, you were the last person there.

18        A.   Okay.

19        Q.   Did you see Matt Slusher acting out at all?

20   Did you see him yelling or screaming?

21        A.   When I got there?

22        Q.   That's right.

23        A.   No, I did not.

24        Q.   Was he able to talk?

25        A.   He didn't talk to me.  I wasn't close

59

1    enough for me to talk to him.  Was he able to talk?  I

2    would imagine, sure.

3         Q.   Did you see him talk to anyone?

4         A.   Yes, I saw him talk to Matt King.  I was

5    there when they shook hands at the end.  What their

6    conversation was, I have no idea.

7         Q.   The story you heard is he took a swing

8    first and Matt King punched.  I want to make sure that's

9    accurate.

10        A.   That was my understanding, Matt Slusher

11   took a swing at Matt King and Matt King ducked down or

12   evaded the hit and punched him back.

13        Q.   Would it have been reasonable for Matt King

14   to have been charged with assault because of the fact

15   that he did have contact or did punch Matt Slusher?

16        A.   I don't feel it would have been, no.

17        Q.   Why not?

18        A.   First of all, I think everyone has a right

19   to defend themself and if you're being attacked by

20   somebody, you have a right to defend yourself.

21   Obviously, according to the investigation, it was that

22   Matt Slusher came on to Matt King's property, was

23   argumentative and yelling, took a swing at him and the

24   only reason, my understanding is, that the swinging

25   stopped was that he got punched back.

1            I don't feel that -- defending yourself is

2     not to cause physical harm, I think it is defending

3     yourself.  There's a difference, I think, being the

4     primary aggressor and changing over from victim to

5     primary aggressor.  I felt like had Matt King punched him

6     in the face and started waling on him and got on top of

7     him, it would have changed roles from the victim to

8     primary aggressor, then I would think that would have

9     changed the dynamics.

10            But that wasn't the case.  He hit him one

11     time and someone called the police and he said I'll stay

12     and talk with the police.

13          Q.    Do you know who called the police?

14          A.    I don't.  I could speculate but I don't

15     know.

16          MR. BARBIERE:   Don't guess, just

17          answer the questions.

18          Q.    You never found out who called the police?

19          A.    Not that I can recall.

20          Q.    Who owned 407 Elm Street?

21          MR. BARBIERE:   You asked that

22          question.

23          A.    I don't know.

24          Q.    You just referred to Matt King as being the

25     owner of that property?

61

1          A.     Well, he was a tenant of that property.

2     Maybe I should rephrase that.

3          Q.     And did you learn at all why Matt Slusher

4     went back to the property?

5          A.     Again, I think I answered that, I think he

6     came back to get his keys and buddy's glasses.  That's my

7     understanding.

8          Q.     So would it have been reasonable for Matt

9     King to have been able to go back into 407 Elm Street and

10    get his personal property?

11         A.     Well, I don't have the answer.  As far as

12    is it reasonable for anyone to get their property,

13    certainly it's reasonable but you change the dynamics of

14    the story, you change things up.  If every time he comes

15    back to the scene he's causing a disturbance, it's best

16    that he goes home and comes back the next day.

17              They told him apparently to leave.  That

18    would be a question as to why they told him to leave.

19    That's something you can ask him.  At the time he came

20    back under his own accord.  We went there and got called

21    back again.

22         Q.     Was it your understanding at the time from

23    talking to Officer Supe or the other officers that Matt

24    Slusher had a different story, a different version of

25    events than Matt King?

1          A.    Yes.  Yes.  Matt Slusher's story, the

2    assault was -- Yes, his was different than Matt King's is

3    my understanding.

4          Q.    What led you to believe Matt King versus

5    believing the story Matt Slusher told?

6          A.    Keep in mind I didn't investigate this.

7    That would be something to ask Officer Supe about or the

8    other officers there.  I just came at the end and found

9    out what was going on and I don't -- I would only be

10   speculating so I don't know.  It was their decision as to

11   why they chose to believe or felt there was more

12   credibility towards Matt King's version of the events

13   versus Matt Slusher's version of the events.  That would

14   be a question for them.

15         Q.    So it was Officer Supe's decision that one

16   person was more credible than the other person?

17         A.    I don't know if it was Officer Supe

18   exclusively.  I think the officers that were there

19   investigating; Officer Neyer, Weldele and Officer Supe.

20   Keep in mind that one of them talked to Matt King, one of

21   them talked to Matt Slusher.  The combination of their

22   investigation determined that Matt Slusher's version of

23   events was not as likely, I suppose, as Matt King's

24   version of the events.  But what specifically was said to

25   them to rule in one favor or the other, you'd have to ask

63

1    them.

2          Q.    You don't know if one of those three,

3    Neyer, Weldele or Supe, talked to any other witnesses

4    there?

5          A.    You would have to ask them, I don't know.

6          Q.    Do you think they acted appropriately

7    according to Delhi policy in charging Matthew Slusher

8    with disorderly conduct?

9          A.    I do.

10          Q.    You were supervising Officer Supe at that

11    time?

12          A.    I was.

13          Q.    Are you still supervising Supe?

14          A.    No, I'm not.  He is still at the road

15    patrol and I have since moved to investigations.

16          Q.    And he's still with road patrol?

17          A.    He is.

18          Q.    Would that be third shift still?

19          A.    Yes.  He teaches DARE as well in January

20    through April or whatever it may be.  He is back in

21    schools and teaches but after that, he's on the road.

22          Q.    What does he do when he teaches DARE?

23          A.    He's a DARE officer, you know, drug

24    education in the schools.  In Delhi Township we have a

25    school resource officer and DARE officer.  School

64

1    resource officer is more of the liaison officer.  That's

2    not his role.  He's basically a teacher for a couple

3    months out of the year.

4            Q.    And how long did you supervise him

5    directly?

6            A.    Well, if I were to guess, I'd say two

7    years.

8            Q.    So you would have been his supervisor

9    during Matt Slusher's case when he was scheduled to

10   appear?

11           A.    Yes, I would have been his supervisor.

12           Q.    And you're aware of the circumstances that

13   led to the case being dismissed?

14           A.    I am.

15           Q.    Can you tell me what those were?

16           A.    My understanding is that he did not show up

17   to court and it was dismissed on the first trial setting.

18   I looked into it and I did see where he received a

19   subpoena and I did see where it was posted.  Who posted

20   it, I don't know, but he did receive it.  I questioned

21   Ron Supe on this and he said that he made a fax, sent a

22   fax off to the prosecutor's office and let them know that

23   he was going to be on vacation, to request a continuance.

24   I checked our fax machine to see whether a fax was indeed

25   sent.  I can't specifically say that this particular fax

1    on this particular day was the one.  It will tell me that

2    we sent faxes to the prosecutor's office but I can't

3    confirm one hundred percent that he did that obviously.

4              It was dismissed the first trial setting.

5    Normally the Court will allow one continuance but I

6    suppose -- I don't want to speak for the judge on a minor

7    D misdemeanor.

8              MR. BARBIERE:   Don't speak for the

9         judge.

10             THE WITNESS:   Okay.

11        Q.   So you said you received a subpoena.  Who

12   do the subpoenas come to in Delhi?

13        A.   Subpoenas come through the teletype and the

14   officer in charge or the sergeant or the corporal on day

15   shift, which would be from the hours of 6:45 a.m. to 4:15

16   p.m., that's their responsibility to pull teletype, look

17   at the teletype and post any court notices that come

18   during the day.  They generally only come during the day.

19             So what happens is, whoever that officer in

20   charge was posted it in our court calendar, which is a

21   computer-generated e-mail, and it was posted.

22        Q.   So the computer generates an e-mail.  Was

23   it like an automatic?

24        A.   No, you enter it in there.  You pull up the

25   court calender, go to the day in question, double click

1    on the day in question, you write whatever the subpoena

2    number is on there, defendant's name, the date and time,

3    the case number and then you put the teletype date, which

4    means teletype date that it came in, and then you send

5    it.  It goes into the computer.  It also generates an

6    e-mail to that particular officer.  You basically invite

7    him into that conversation.

8           Q.    Would it invite any other officer?

9           A.    No, just the person subpoenaed.

10          Q.    Not a supervising officer?

11          A.    No, just the person that was subpoenaed.

12   Generally speaking, that only is on a person who signs a

13   charge.  So if there is a domestic violence, two people

14   are really needed, one officer signs the complaint.  It

15   will only get generated to that one officer and so that's

16   all it's subpoenaed for.

17          Q.    For example, if it was Officer Supe and

18   Neyer who responded to the scene of a crime and only one

19   of them signed the NTA, only one would receive the

20   subpoena?

21          A.    Correct.

22          Q.    Okay.  And you mentioned that you could

23   tell that a fax was sent, you can't tell -- there's no

24   record or document that's generated showing what the

25   actual transmission was?

1    A.    No.  No.  I don't know what was sent.  I

2    can pull up that faxes were sent to different numbers

3    during the course of the day but I don't know what was

4    particularly said on them.  I tried to inquire of the

5    prosecutor's office but I didn't get anywhere.

6    Q.    Would that be something that the individual

7    officer could have saved, the fax?

8    A.    Could have saved?  I suppose he could have

9    saved it.  Does he normally save it?  That's up to each

10   individual officer.

11   Q.    Did you check in this case with Officer

12   Supe to see if he kept the cover sheet or the fax that he

13   sent to the prosecutor?

14   A.    No.  To my knowledge he did not save

15   anything.  He sent it off and that's all I know.  Keep in

16   mind I didn't know that at all until this whole situation

17   arised.  I'm not privy to that information as far as like

18   he doesn't come to me and say he's on vacation.

19   Q.    You're saying you weren't aware that there

20   was a court date that he missed while he was on vacation

21   until the lawsuit was filed?

22   A.    Maybe someone else was, but I wasn't.

23              (Plaintiff's Exhibit No. 10 was

24               marked for identification.)

25   Q.    Go ahead and look at the date on that.

68

1          A.      (Witness complied.)  Okay.

2          Q.      Is this a document that would have been

3    generated from your computer?

4          A.      This is a copy that I printed out from my

5    computer.  Whether I was the one who originally put it in

6    there, I don't know but what I did is I pulled this up to

7    show that on -- This is exactly what I was saying.  It

8    says under Steven M. Slusher, in this case the

9    defendant's name, the room number, 240, the time, 9:00 in

10   the morning, the case number assigned by the prosecutor's

11   office, and TT is teletype.  That teletype was sent on

12   9/18.  So on 9/18 that teletype was sent to our police

13   department, advising that Ron Supe had court on Steven M.

14   Slusher.

15          And then at the top it shows on 9/28,

16   2007 -- in this particular, the way it's formatted, it

17   shows 9/28 would have been the date court notifies us.

18   So the way I read it, we were notified 10 days in advance

19   that he had court.

20          Q.      It says on the subject line RLS.

21          A.      We go by initials.  Ron L. Supe.

22          Q.      This would have been generated to you?

23          A.      No.  I just pulled it up for these

24   purposes.  I pulled it up to see.  Whoever entered it

25   into the system -- it could have been me.  I doubt it

69

1    because I am third shift, don't do teletype.  It was

2    probably generated by someone else.  The only reason I'm

3    seeing this now is because I printed this out.  I looked

4    into whether he got notified or not and I found where we

5    were notified.  I printed it off showing that so my name

6    is on the top.

7         Q.    When you say that you found that, we were

8    notified, you're talking about yourself and Ron Supe or

9    just Ron Supe?

10        A.    I apologize, Delhi Township.  We, as a

11   whole.  I was asked to find out whether the Delhi

12   Township Police Department, specifically Ron Supe, was

13   notified about this court date.

14             MR. BARBIERE:   Just for the record, I

15             think it is protected by the attorney-client

16             privilege.  It was in response to your

17             discovery request that this was done.

18             MS. REINO:   Okay.

19        Q.    So at the top of the page where it says

20   Macaluso, that's not coming from your calendar, is that

21   what you're trying to tell me?

22        A.    I just print it out.  I'm just the one that

23   printed it out and therefore my name is on there.

24        Q.    This is not an e-mail?

25        A.    I pulled up that court calendar of 9/28 and

70

1    I hit the print button.  When it printed out, since I

2    pulled it up, my name came up on the top.  If you're

3    asking me whether I'm the one --

4            MR. BARBIERE:    Just answer the

5        question.

6            THE WITNESS:    Okay.

7        Q.    So at the time we're talking about, it

8    looks like September 28th, 2007, which was the Court

9    date.  At that time you would not have received any

10   document or electronic mail or calendar note that there

11   was this court date for Ronald Supe?

12       A.    No.

13       Q.    And did you have any opportunity to

14   evaluate Ron Supe when you were supervising him?

15       A.    I did.

16       Q.    I want to take a look at the evaluations.

17                        (Plaintiff's Exhibit No. 11 was

18                        marked for identification.)

19       Q.    Are you ready?

20       A.    I'm ready.

21       Q.    Okay.  We've marked this Employee

22   Evaluation Form as Exhibit No. 11.  Take a look at that

23   for me and tell me when you're finished.

24       A.    (Witness complied.)  I've finished.

25       Q.    You've reviewed it?

1          A.    I reviewed it.

2          Q.    Is this the evaluation form that you

3     completed for Ron Supe?

4          A.    This is.

5          Q.    And this was 2006?

6          A.    Correct.  It's rating period of January

7     1st, 2006 till December 31st, 2006.

8          Q.    Are officers evaluated annually or

9     biannually?

10         A.    After their probationary period they are

11    evaluated annually.

12         Q.    So for the year 2006 had Officer Supe

13    already come through the probationary period?

14         A.    Yes.

15         Q.    Okay.  There are two areas where you noted

16    that he needed improvement, and I think that's on the

17    very last page or the second-to-last page, page 7 of 8.

18         A.    Okay.

19         Q.    Can you explain exactly what you were

20    talking about there as needing improvement?

21         A.    Can you tell me what one you're talking

22    about?

23         Q.    There are two areas that you mentioned.

24         MR. BARBIERE:    One is conduct traffic

25    stops here.

1           THE WITNESS:   I thought it was 7 of 8.

2           MR. BARBIERE:   She's referring to your

3      comment of the two areas.

4           THE WITNESS:   Okay.

5      A.    On page 2 of 8, conduct traffic stops, I

6  put on there, "Traffic enforcement needs to improve.  You

7  rarely make a stop.  I'm not concerned with the number of

8  tickets; warnings can suffice at times."

9      Q.    What do you mean by he rarely made a stop?

10     A.    Some officers are very proactive, some

11 officers are reactive.  We like to have them proactive,

12 not just on traffic stops, proactive on building checks,

13 on citizen contacts and in this particular field it says,

14 conduct traffic stops, I would have to evaluate that and

15 my opinion of Officer Supe was that he rarely made a

16 traffic stop.  He was more reactive to an auto accident.

17 Reactive doesn't mean he didn't make stops, just meant he

18 didn't make a lot.  And the big thing I put on there was

19 I'm not concerned with tickets, it's not a matter of

20 tickets, warnings can suffice but I think it's when

21 you're out there for nine hours there are times when you

22 see things, you should probably see things.  That's why I

23 felt he needed to improve.

24     Q.    You mentioned two areas in your comments on

25 page 7.  What was the second thing?

1          A.    Oh, originate new cases.  I think I talked

2    about this as well, "Improvement needed in this area;

3    will increase when you are more proactive versus

4    reactive."  On these evaluation forms, which by the way

5    we don't use anymore, we have to put something in there,

6    in every one of them.  And in this case, originate new

7    cases, in this I felt like in order to originate a new

8    case would be if he, instead of reacting to a theft

9    report or reacting to an accident, he could be more

10   proactive, which I just talked about.  So it kind of went

11   hand in hand with the traffic stops.

12        Q.    And you say on page 7 that this was the

13   same two areas that were addressed by Sergeant Braun

14   previously.  Would that have been 2006 that you were

15   referring to?

16        A.    I would imagine.  I was not the supervisor

17   probably for him in 2006, Sergeant Braun was, and he came

18   on to my squad and the two areas that Sergeant Braun also

19   felt that he needed to work on were probably the same two

20   areas that I felt like he needed to work on.

21        Q.    And did the Delhi Police Department or

22   yourself do anything subsequently to improve his

23   performance in those two areas?

24        A.    On traffic stops?  I don't recall if he

25   took any other classes during the course of the year or

74

1    not.  I don't recall.

2            Q.    Did you recommend anything, any training or

3    supervision?

4            A.    No.  If I would have, it probably would

5    have been in here.  Normally if we required improvement,

6    sometimes there would be a conditional -- I'm sorry,

7    that's not what I was thinking.  No.  No.

8            Q.    How long had Officer Supe been with Delhi

9    Police Department when you started supervising him?

10           A.    I don't know.

11           Q.    Had he been there longer than you or he

12   came after?

13           A.    He came after.

14           Q.    Was he a new recruit?

15           A.    No, he came from the City of Cincinnati.

16           Q.    How long had he been with Cincinnati Police

17   Department?

18           A.    I don't know.  You'd have to ask him.  I'm

19   not sure.

20           Q.    Did he have to go through the same training

21   that you described earlier today; the four weeks of

22   training with a field training supervisor?

23           A.    Yes.  He would have gone through a field

24   training program with us as well.

25           Q.    Did you spend any time with him during that

1    period?

2          A.    No.  I was not his field training officer.

3          Q.    You were here earlier and you probably

4    heard Chief Coletta talk about the eight hours of

5    continuing education that he took annually.  Was there

6    ever a time when you were given training on how to

7    establish probable cause?

8             MR. BARBIERE:  That's the mandatory

9           training that he talked about?

10          MS. REINO:  He's talking about the

11         mandatory training, yes.

12         Q.    Was there anything besides the mandatory

13    training?

14         A.    On strictly probable cause?

15         Q.    Yes.

16         A.    Nothing that I recall.

17         Q.    What about on investigations, generally?

18         A.    Whether Officer Supe went to an

19    investigative school, I don't know.  You'd have to ask

20    him.

21         Q.    Did you go to investigators school?

22         A.    I have, but recently.

23         Q.    What were the topics that would have been

24    covered?

25         A.    This was just recently, a few weeks ago.

76

1    It's called Reid, R-e-i-d, and it's just an evaluation of

2    how to read people during the interviews and

3    interrogations.  There's also something called Street

4    Survival but not all officers take it and I don't know

5    whether Officer Supe has.  I have not.

6            Q.    The Reid program, who put that on?

7            A.    John Reid and Associates.

8            Q.    So it's an outside contractor?

9            A.    Correct.

10           Q.    Did you ever receive a complaint from

11   either Matthew Slusher or his father, Steven Slusher,

12   about the way this case was handled?

13           A.    No.  The only thing that I did, again, was

14   the night in question when he pulled up in the car and

15   wanted to inquire as to why there wasn't an assault and

16   once we talked, that was it.  That was the end of it.

17           Q.    And did Steven Slusher, Matthew's father,

18   tell you he wanted to file a complaint against Matt King?

19           A.    I don't recall what he said.  I think he

20   was more inquisitive but I don't remember.

21           Q.    And did Matt Slusher ever say anything

22   about wanting to file charges against Matt King?

23           A.    Not to me.

24           Q.    And to your knowledge was anybody ever

25   disciplined for these incidents?

1          A.     No, not to my knowledge.

2          Q.     Now are you aware of whether Officer Supe's

3    performance in those two areas that you were talking

4    about, traffic stops and being more proactive, do you

5    know if that's improved?

6          A.     You'd have to talk to his current

7    supervisor, I don't know.

8          Q.     Did you give him an evaluation for 2007?

9          A.     I probably -- Yes, I would have, because I

10   just, I just became a lieutenant and left that squad so I

11   would have given him one.

12         Q.     When you were talking to Steve Slusher back

13   on September 2nd, did you have the in-car camera

14   activated?

15         A.     No.  I wasn't inside my car but, no, I did

16   not.

17         Q.     What about the audio equipment?

18         A.     I did not.

19         Q.     And that would have been something that you

20   could have recorded?

21         A.     At my discretion, yes, I guess I could have

22   recorded it.

23         Q.     Was Steve Slusher ever inside your car?

24         A.     No.

25         Q.     He was outside the car?

1          A.    Correct.

2          Q.    Were you outside the car also?

3          A.    Yes.

4          Q.    Was anybody else around that would have

5     overheard that conversation?

6          A.    No, just him and I.

7          Q.    I'm getting towards the end.

8          MS. REINO:    Can we take a five-minute

9          break?

10         MR. BARBIERE:    Sure.

11                          (Short recess.)

12         Q.    I want you to look at I believe -- let's

13    see.  This is Exhibit 8.  Go ahead and review that.

14         A.    Okay.  (Witness complied.)

15         Q.    That's a report by Detective Roberts.  Do

16    you know what the date is on that document?

17         A.    Looks like October 30th, 2007.

18         Q.    Okay.  Did you have an opportunity to look

19    at that before you prepared for this deposition?

20         A.    I did.

21         Q.    And did you have an opportunity to look at

22    that in 2007 while the investigation was still open?

23         A.    No.

24         Q.    So you didn't review that before?

25         A.    No.  Wasn't my responsibility.

79

1          Q.    Okay.  Detective Roberts mentions in there

2     that Matt Slusher was not available to come down to give

3     fingerprints.

4          A.    Okay.

5          Q.    Was it appropriate in your mind to close

6     the case at that point?  Detective Roberts mentions

7     closing the case.

8          A.    Well, first of all, I won't speak for

9     Detective Roberts but at some point in time in my opinion

10    if you have somebody that does not want to follow through

11    with the investigation, you do have to close the report

12    out.  The date of the incident is 9/2/2007, date of

13    closure is 10/30/2007.  It had been a couple months.  At

14    some point you have to close it out.  So it's his

15    decision.

16         Q.    Do you know if Detective Roberts did any

17    follow-up after -- he's talking about one or two days

18    after the event in that memo?

19         A.    You'd have to ask him.

20         Q.    He also references fingerprints being taken

21    from the trunk and I think the door.

22         A.    Okay.

23         Q.    What happens when a detective takes prints

24    like that?  What happens to the actual fingerprint card?

25         A.    They get put into a print drawer and

80

1    normally you would call the owner of the car, the person

2    who normally rides or drives in the car, and asked to get

3    a comparison set of prints done to try to rule them out.

4    Once you do that, then if they're of quality prints, you

5    would submit them and see if they come back with any type

6    of hit on the fingerprint.

7         Q.    So in a case like this where there haven't

8    been any comparison prints, to your knowledge what would

9    be done with the prints that were taken?

10        A.    As far as destroying the prints or keeping

11   them?

12        Q.    Keeping them or destroying them.

13        A.    I'm sure they would still be on file.

14        Q.    If you'd go back to the other memo we

15   talked about earlier where Supe was attributing some

16   statements to you, that's Exhibit No. 5.

17        A.    Okay.

18        Q.    Look at the second paragraph.  It's the

19   second sentence, "I discussed the incident with

20   Sgt. Macaluso ..."  Do you see that?

21        A.    I do.

22        Q.    Do you agree that you advised him to carry

23   the case only as a theft from auto as opposed to a theft

24   of the automobile?

25        A.    I do.

1          Q.    And what was the basis for your decision?

2               MR. BARBIERE:    Objection.  I think

3          that's been asked and answered at least

4          twice.  Go ahead and answer.

5          A.    Okay.  I spoke with Officer Supe.  He

6    advised me that he felt that the story, his version of

7    events and how it took place was a little suspicious,

8    felt there was maybe more to the story than his car was

9    stolen.  I told him regardless, we would still need to

10   take a report and look into that, which we did.  I told

11   him to put down the words, we may revisit the idea of an

12   auto theft if we come up with a suspect, keeping in mind

13   when we write an offense report in which you charge

14   somebody are two different things.  You can add things

15   down the road.  If we would have found the person

16   responsible for the auto theft and the person responsible

17   for breaking into the car, he or she could have been

18   charged accordingly.

19         Q.    So you don't agree you're carrying it only

20   as a theft from the auto, you are saying that you were

21   considering looking at it as a theft of the car?

22         A.    I told him it was okay to take it as a

23   theft report, theft from the auto and if we developed a

24   suspect, then the investigator may want to revisit when

25   he talks to the suspect of an auto theft as well to find

1    out whether that person was also responsible for stealing

2    the car.

3         Q.    So only if he develops a suspect for

4    actually stealing the car?

5         A.    Well, yes, if he finds the suspect.  I mean

6    we didn't have to enter the vehicle into the computer.

7         Q.    The other thing I'm looking at here is in

8    the first paragraph back when we were talking about Matt

9    Slusher allegedly at 407 Elm Street all night drinking

10   and partying with the local thugs, do you agree with the

11   characterization of Brad DeAngelo and Charles Jones as

12   local thugs?

13        A.    That is Officer Supe's opinion.  Very

14   rarely do I tell somebody not to put their opinions in

15   there.  It's for the investigator.  Could he have worded

16   it, put it down as with Brad DeAngelo and Charlie Jones,

17   yes, he could have but as far as I mean -- I guess I'm

18   kind of confused to your question.  Do I think -- Repeat,

19   whether I think what?

20        Q.    Do you think they're local thugs?

21        A.    I think we've had numerous contact with

22   them.

23        Q.    Officer Supe's report also says that

24   considering who his friends are, who Matt Slusher's

25   friends are, this is a suspicious or fishy story.

1        MR. BARBIERE:   Wait a second.  That's

2        not what it said.

3        Q.   In the second paragraph.

4        MR. BARBIERE:   It doesn't say, based

5        upon who his friends are this is a fishy

6        story.

7        MS. REINO:   "... in talking to Matt

8        about the incident and considering who he

9        considers his friends, something is

10        definitely not adding up about this alleged

11        incident."

12        MR. BARBIERE:   Okay.

13        Q.   What's your understanding of who he

14  considers his friends?

15        A.   I have no idea who he considers his

16  friends.

17        Q.   Is that something that Officer Supe or

18  Neyer talked to you about?

19        A.   No.

20        Q.   Who his friends were?

21        A.   No.

22        Q.   Do you think just because somebody

23  associates with somebody who may have a criminal record,

24  that would mean their story or crime committed against

25  them was less credible?

84

1          A.    No.  If you're saying -- no, I don't think

2    that.

3          Q.    That seems to be the assumption that

4    Officer Supe is making.

5                MR. BARBIERE:   I'm going to object.

6          That's not a question.  Objection.

7          Q.    It also says here at the end of the second

8    paragraph, "Matt told us that the owner of 407 Elm, Rob

9    Wagner, Jr. expressed some displeasure with him for

10   'bringing the police around his house tonight.'"  Was Rob

11   Wagner ever considered a suspect in the theft of the car

12   or from the car?

13         A.    You would have to talk to Detective

14   Roberts.  I don't know.

15         Q.    And that's not something you talked about

16   with Detective or Officer Supe?

17         A.    No.

18         Q.    Have you personally responded to 407 Elm

19   Street for calls?

20         A.    I have.

21         Q.    Did any of those calls involve violence?

22         A.    Fight runs before, yes.

23         Q.    What about the calls you mentioned where a

24   firearm was mentioned?

25         A.    I did not ever go to a call where we

1    determined for sure that a firearm had been discharged.

2          Q.    Did you ever determine that the firearm was

3    discharged or anybody carried a gun on September 2nd,

4    2007?

5          A.    No, I did not have any knowledge of that.

6          Q.    Did you ever learn whether Joey Folkert

7    recovered his glasses?

8          A.    I have no idea.

9          Q.    I don't have anything further for you.

10         A.    Okay.

11

12

13                _____

14          JOSEPH J. MACALUSO, JR.

15

16             (Deposition concluded.)

17

18

19

20

21

22

23

24

25

**DRAPER & OESTREICHER**
**3609 W. EIGHTH STREET**
**CINCINNATI, OHIO 45205**
**PHONE NO. 513-244-2223**

DEPOSITION CHANGES, CORRECTIONS, OR ADDITIONS:

PAGE, LINE,        SHOULD BE

Page 5 - Line 22      Should Be: "Delhi Township
Department is my First..."

Page 47 - Line 20  - Should be "or Drove By"

Page 57 - Line 5- Should Be " Quality Prints

_____
Signature

86

```
1                        CERTIFICATE

2     STATE OF OHIO      :

3                        : SS

4     COUNTY OF CLERMONT:

5          I, Shandy Ehde, court reporter and Notary Public in

6     and for the State of Ohio, do certify that before the

7     giving of his deposition, JOSEPH J. MACALUSO, JR. was by

8     me first duly sworn to depose the truth, the whole truth,

9     nothing but the truth; that the foregoing deposition was

10    given at said time and place by notice and agreement of

11    counsel, that said deposition was taken in stenotypy and

12    transcribed by computer under my supervision, and

13    submission to the witness for signature was expressly

14    required.

15         I certify that I am neither a relative of, nor

16    attorney for any of the parties to this cause, nor

17    relative or employee of any of their counsel, and have no

18    interest whatever in the result of this action.

19         IN WITNESS WHEREOF, I have set my hand and seal at

20    Cincinnati, Ohio this 21st day of January, 2009.

21

22                                        Shandy Ehde

23                          Notary Public - State of Ohio

24    My Commission Expires:

25    August 27, 2012
```