**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Steven Matthew Slusher,          )
                                 )
       Plaintiff,          )     Case No. 1:08-CV-273
                                 )
    v.                           )
                                 )
Delhi Township, Ohio,            )
<u>et al.</u>,                   )
                                 )
       Defendants.         )

<u>O R D E R</u>

      This matter is before the Court on Defendants' motion for summary judgment (Doc. No. 23). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED IN PART AND MOOT IN PART**. The motion for summary judgment is well-taken and is **GRANTED** as to Plaintiff's federal constitutional claims. Those claims are **DISMISSED WITH PREJUDICE**. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. Accordingly, Defendants' motion for summary judgment as to Plaintiff's remaining state law claim is **MOOT**. Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.

## I. <u>Factual and Procedural Background</u>

      At around 10:00 p.m. on the evening of September 1, 2007, Plaintiff Steven Matthew ("Matt") Slusher and his friend Joey Folkert went to a party at the home of Rob Wagner, located at 407 Elm Street in Delhi Township, Ohio. 407 Elm Street is a

1

duplex, with one apartment on the first floor and one apartment on the second floor. Both apartments share a common porch. Wagner occupied the second floor apartment and a man name Matt King lived in the first floor apartment.

At the time, Plaintiff was 19 years old and Folkert had just turned 21 years old. Wagner had parties at his home every weekend and underage drinking was common. Plaintiff, however, was not drinking this night and in fact was the designated driver and drove Folkert to the party in his 2000 Pontiac Grand Prix. Wagner's parties generated frequent noise complaints from neighbors to the Delhi Township Police Department.

On this particular evening, the party spilled out onto the lawn. At some point, a fistfight involving six or seven people broke out. About ten minutes after the fight started, two Delhi Township Police Officers arrived at the house, including Defendant Ronald Supe. When the officers arrived, many of the partygoers scattered or ran inside the house. However, Plaintiff and Folkert remained in the yard. According to Plaintiff and Folkert, Supe ordered everyone who was still there to leave the premises and would not allow Plaintiff to go back into the house to retrieve his car keys and Folkert's eye glasses.

Plaintiff and Folkert left and walked to a nearby restaurant where they remained for about an hour before returning to the house to see if they could retrieve their belongings.

When they got back to 407 Elm Street, Matt King was on the porch with Wagner, Steve Powers, Jason Rebholz, and Charlie Jones. Except for King, each of these people had been at the party earlier. Powers was holding a crow bar and at least one of the others had a baseball bat. When they got to the porch Folkert asked King if anyone had found his glasses. At that point, King accused Plaintiff and Folkert of bringing guns to the party, pushed Folkert, threw a punch at him which missed, and then started chasing him. As he ran away, Folkert called 911 on his cell phone. Meanwhile, Plaintiff remained standing by the porch. King returned to Plaintiff, grabbed him by the shirt and told him to "call the guy that got into the fight." As Plaintiff pulled out his cell phone, King punched him in the jaw, breaking it in two places.

Another Delhi Township Police Officer, Defendant Brian Weldele, was the first officer to respond to the 911 call at the corner of Delhi Pike and Elm Street, about two houses from 407 Elm Street. He was followed closely by Officer Paul Neyer, also a defendant in this case, and Defendant Supe. Plaintiff, Folkert, and King were all standing at this corner when Weldele arrived. Weldele took the lead in investigating the call and spoke with Plaintiff first. According to Weldele, Plaintiff would only state that he came back for his keys and that King hit him. On the other hand, according to Weldele, when he spoke to

King, King said that he had been out for the night but had received a call from his live-in girlfriend about people standing on the front porch and banging on their front door.  Weldele testified that King told him that he arrived home to find Plaintiff and Folkert standing on the front porch.  King told Weldele that when he asked Plaintiff what he and Folkert were doing, Plaintiff became belligerent.  King told Plaintiff to "get out of his face" and if he did so again, King was going to punch him.  King then claimed that Plaintiff made an aggressive move towards him so King punched him one time, supposedly in self-defense.

According to Weldele, while King was telling his side of the story, Plaintiff was standing in the background, flailing his arms and yelling "This is fucking bullshit."  Weldele Dep. at 11.  Supe also testified that Plaintiff was acting in this manner and that he warned Plaintiff to calm down.  Supe Dep. at 24-26.  Plaintiff admitted that he said "This is bullshit" but denied that he was yelling or flailing his arms.  Plaint. Dep. at 62-63.  According to Supe, Plaintiff persisted in this behavior after a third warning to calm down, so he handcuffed Plaintiff, placed him in the patrol car, and cited him for disorderly conduct.  Supe Dep. at 26-30.  Supe then released Plaintiff after Plaintiff signed the citation.  Id.  Weldele testified that he did not think he had probable cause to arrest Matt King for punching Plaintiff because he felt that Plaintiff was the primary

4

aggressor and that King was acting in self-defense. Weldele Dep. at 20.

At that point, Plaintiff still did not have his car keys and Office Supe refused to give him a ride, so he started to walk to his home, about a mile away. Plaint. Dep. at 65-68. In the meantime, Folkert, who had left the scene earlier and was walking to his home on Fehr Road, called Plaintiff's father and told him that he thought that Plaintiff was going to be arrested, and might need to go the hospital because he was bleeding from the jaw and it was crooked-looking. Folkert. Dep. at 63-64. Mr. Slusher arrived at the scene after Plaintiff left to walk home. One officer on the scene did not respond when Mr. Slusher asked where Plaintiff was, but another officer, Defendant Neyer, overheard the question and drove his cruiser down the street, picked up Plaintiff, and delivered him to Mr. Slusher. Slusher Dep. at 22-23; Plaint. Dep. at 69; Neyer Dep. at 28-30.

When Plaintiff and his father got back home, Plaintiff called his sister and then they both went back to Folkert's house to discuss the incident. Plaintiff. Dep. at 71-72. Plaintiff was at Folkert's house for about an hour and then returned home with his sister via Wilke Drive. As they were driving on Wilke, Plaintiff saw his car (recall that he had left it at Wagner's house on Elm) with the back window broken out. Plaintiff also discovered that things had been stolen from the car, including the CD player, $50 in cash, and Folkert's golf clubs.

Once again, the Delhi Township Police were summoned and Defendant Supe and another officer responded to the scene. According to Plaintiff, as he was listing the items taken from his car, Supe asked him where he got his CD player. Plaintiff told Supe that he bought it from a friend for $10 and then, according, to Plaintiff, Supe accused him of having stolen property. In his report of the incident, Supe wrote:

> Units were dispatched to 433 Wilke Dr. for a theft from auto report. Myself and Officer Weldele responded and were met by Steven Slusher and his son Matt. The car, a Pontiac Grand Prix, was parked in the dirt in front of this location with the rear window broken out and the dashboard removed and the stereo missing. Officers had been in contact with Matt Slusher 4 separate times prior to this call, all involving fights and disorderly behavior, one of the contacts involved Matt receiving a disorderly conduct ticket by this officer. Matt stated that he had been at 407 Elm Street all night drinking and partying with our local thugs, including Brad Deangelo and Charles Jones. Matt said he left the car parked in the driveway at 407 Elm and left the keys with the occupants on the second floor because he was too drunk to drive home. Matt advised that after he responded home, he and his sister took his friend home to Delridge. He says that on the way back home they drove down Wilke Dr. and came across his car in the above condition.
>
> It is obvious that someone drove his car from Elm St. to Wilke Dr., however, in talking to Matt about the incident and considering who he considers his friends, something is definitely not adding up about this alleged incident. I discussed this incident with Sgt. Macaluso and he advised that even though this appears to be an auto theft/recovery we will carry this as only a theft from auto. This is due to Matt's fishy story and the possibility that Matt may actually be involved in this somehow. It should be noted that when he was asked the value of the stereo he said he bought it from a friend for $10, which, considering his "friends" I would think that the stereo is already stolen property.

> Also, Matt told us that the owner of 407 Elm, Rob
> Wagner Jr. expressed some displeasure with him for
> "bringing the police around his house tonight."
>
> If for some chance we would be able to find any
> suspects in this, we may want to revisit the idea of
> auto theft, but for now carrying this as a theft from
> auto is sufficient.  Also, if the detective assigned to
> this would like to consider any fingerprinting, the
> only thing that may hold suspect prints would be the
> driver and passenger door handles and trunk.  The dash
> board area is a patterned texture that can not [sic] be
> printed.
>
> Nothing more at this time.

Doc. No. 30-3, at 3.

Defendant William Roberts, a detective on the Delhi

Township Police Department, investigated the theft of Plaintiff's

car.  Roberts started his investigation on September 4, 2007 by

calling Plaintiff's home to speak with Kimberly Slusher,

Plaintiff's mother.[1]  According to Roberts, Mrs. Slusher only

wanted to talk about the fact that Plaintiff had been cited for

disorderly conduct.  Roberts explained that he was only

investigating the theft from the car and then asked if he could

speak with Plaintiff.  Roberts testified that Mrs. Slusher told

him that he could not speak with Plaintiff because Plaintiff's

jaw was broken and he was in too much pain.  Roberts then

requested that Plaintiff contact him when he was able to speak.

Roberts Dep. at 12.  The following day, Roberts went to

Plaintiff's house and lifted some prints from the car.  Roberts

---

[1]     The Grand Prix was registered to her.

called the Slushers again later in the day and this time he spoke with Mr. Slusher. Roberts told Mr. Slusher that he had recovered some fingerprints from the car and asked him if Plaintiff could come down to the station to provide a set of comparison prints. Mr. Slusher told Roberts that Plaintiff was still in too much pain to come to the police station. Roberts then asked that Plaintiff contact him when he was able to so he could take a statement and get some comparison prints. Roberts closed the case on October 30, 2007, according to him, because Plaintiff failed to contact him and because the police department received a letter from the insurance company indicating that the Slushers had been reimbursed for their losses. Roberts Dep. at 18. In a case note, Roberts wrote, "Request this case be closed with victim refusing to cooperate." Doc. No. 30-3, at 9.

The state municipal judge eventually dismissed the disorderly conduct citation against Plaintiff when Supe failed to appear at the scheduled court date. Supe Dep. at 73. Supe was on vacation out of state and the prosecutor's office apparently did not receive, or ignored, a fax he sent explaining that he was not available on the scheduled date. Id.

On April 18, 2008, Plaintiff filed the instant lawsuit against Delhi Township, Officer Ronald Supe, Officer Paul Neyer, Officer Joseph Macaluso, Officer Brian Weldele, and Detective William Roberts. Plaintiff sues the individual defendants in

both their official and individual capacities.  Plaintiff's first cause of action presents a claim pursuant to 42 U.S.C. § 1983 against the Defendants for alleged violations of his right to be free from unreasonable searches and seizure, the right to equal protection of the laws, and the right to due process of law.  As written, Plaintiff's second and third causes of action apparently present state law claims for false arrest and malicious prosecution.

Following discovery, Defendants filed a motion for summary judgment on each of Plaintiff's claims.  Doc. No. 23. Defendants' motion for summary judgment has been briefed and is now ready for disposition.

## II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Id.</u>

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." <u>First National Bank v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in

court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. <u>Id.</u>; <u>Anderson</u>, 477 U.S. at 250. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts

showing that there is a genuine issue for trial." <u>Id.</u>

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. <u>Id.</u> Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

## III. <u>Analysis</u>

Plaintiff's complaint asserts in general fashion that Defendants violated his constitutional right to be free from unreasonable searches and seizures, his right to equal protection of the laws, and his right to due process. In his memorandum in opposition to Defendants' motion for summary judgment, Plaintiff states that he "brings this action for violating his right to equal protection under the law and for false arrest and malicious prosecution." Doc. No. 31, at 6. Thus, to the extent that the complaint asserted a claim for a due process violation, Plaintiff has apparently abandoned it. The Court also notes that it is not entirely clear whether Plaintiff still maintains a Fourth Amendment claim for arrest without probable cause. In his memorandum in opposition to the motion for summary judgment, the

caption to Section III.B.3 states "Contested Facts Preclude Summary Judgment for Defendants on the State Law Claims." Subsection III.B.3.a, captioned "False Arrest," however, discusses false arrest in the context of § 1983 and cites only federal cases. There is no discussion of false arrest in the context of state law. Therefore, it appears that Plaintiff still intends to maintain a § 1983 claim for false arrest or arrest without probable cause, but he has abandoned his state law false arrest claim, to the extent there ever was one. Finally, Plaintiff's memorandum clarifies that he is asserting an equal protection claim as a "class of one" pursuant to the U.S. Supreme Court's decision in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000). In <u>Olech</u>, the Court held that an individual may maintain an action for a violation of his right to equal protection where he alleges that he "has been intentionally treated differently from others similarly-situated and that there is no rational basis for the treatment." <u>Id.</u> at 564

Defendants' motion for summary judgment raises a number of issues, including whether they are entitled to qualified immunity on Plaintiff's federal constitutional claims. However, before addressing the qualified immunity question, the Court will determine whether the record, viewed in the light most favorable to Plaintiff, establishes any constitutional violation at all. <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 818-22 (2009)(holding

13

district court may determine whether record establishes
constitutional violation before addressing whether right at issue
was clearly established).  Accordingly, the Court will address
the substance of Plaintiff's constitutional claims and then, to
the extent necessary, deal with immunity issues.

## A. Equal Protection - "Class of One"

As indicated, in order to establish an equal protection
violation as a "class of one," the plaintiff must demonstrate
that the state treated him differently from other similarly-
situated persons and that there is no rational basis for the
difference in treatment.  <u>Supra</u>, at 13.  Under the rational basis
test, "courts will not overturn government action unless the
varying treatment of different groups or persons is so unrelated
to the achievement of any combination of legitimate purposes that
the court can only conclude the government's actions were
irrational."  <u>Warren v. City of Athens</u>, 411 F.3d 697, 710 (6th
Cir. 2005) (internal quotation marks and brackets omitted).  A
"class of one" plaintiff may show that the government action
lacks a rational basis by "negativing every conceivable basis
which might support the government action or by demonstrating
that the challenged action was motivated either by animus or ill-
will."  <u>Id.</u> at 711 (internal quotation marks and brackets
omitted)(citing <u>Klimik v. Kent County Sheriff's Dept.</u>, 91 Fed.
Fed. Appx. 396, 400 (6th Cir. 2004) and <u>Bower v. Village of Mount</u>

<u>Sterling</u>, 44 Fed. Appx. 670, 677-78 (6th Cir. 2002)).  In this case, Plaintiff does not argue that the Defendants lacked a rational basis for the manner in which they handled the investigations at issue in this case.[2]  Accordingly, in order to succeed on his equal protection claim, Plaintiff must demonstrate that the Defendants' actions were motivated by animus or ill-will.

In <u>Klimik</u>, the Court stated that in order to "demonstrate ill will under <u>Olech</u>, a plaintiff must prove that the challenged government actions were motivated by personal malice unrelated to the defendant's official duties."  91 Fed. Appx. at 401; <u>see</u> <u>also</u> <u>Taylor Acquisitions, L.L.C. v. City of Taylor</u>, 313 Fed. Appx. 826, 838 (6th Cir. 2009).  The Court observes that neither <u>Klimik</u> nor <u>Taylor Acquisitions</u> explain under what circumstances a government official's malice or animus toward the plaintiff is unrelated - but review of the few meritorious "class of one" cases from this Circuit, as well as <u>Olech</u>, suggests that the government official must have some pre-existing bias or motive to retaliate against the plaintiff.  For instance, in <u>Bower</u>, the Court held that the plaintiff stated a

---

[2]    Indeed, there was a rational basis for Defendants' actions.  Officer Weldele was presented with conflicting stories about who the aggressor was in the first incident.  Detective Roberts' investigation of the car theft stalled when Plaintiff failed to contact Roberts to provide the additional information he needed to go forward.

claim under <u>Olech</u> where he alleged that the mayor denied him the opportunity to become a full-time village police officer because his parents were political opponents of the mayor. 44 Fed. Appx. at 678. In <u>Warren</u>, although <u>dicta</u> because plaintiffs waived the issue on appeal, the Court observed that the city's action in erecting barricades around plaintiffs' drive thru arguably was motivated by animus because their son had defeated the incumbent city prosecutor in a primary election. 411 F.3d at 711. In <u>Olech</u>, the plaintiff alleged that the village's demand for a larger easement in order to connect her property to the municipal water supply was motivated by ill will because of an earlier, successful lawsuit plaintiff had filed against the village. 528 U.S. at 563.

A useful analogy, in the Court's opinion, is the extra-judicial source doctrine in which a trial judge will be compelled to recuse from a case if he or she has "personal bias . . . that emanates from some source other than participation in the proceedings or prior contact with related cases." <u>Wheeler v. Southland Corp.</u>, 875 F.2d 1246, 1251 (6th Cir. 1989). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994). In other words, under the extrajudicial source doctrine, negative

opinions about a party developed by the trial judge during the course of the proceedings generally are insufficient to justify recusal on the grounds of bias.  E.g., Scott v. Metropolitan Health Corp., 234 Fed. Appx. 341, 360-61 (6th Cir. 2007). Applying the extrajudicial source analogy to the requirement that the public official's animus toward the plaintiff be unrelated to his unofficial duties, the conclusion results that an official's bias or animus toward the plaintiff that arises from the performance of his official duties is not actionable under a "class of one" theory.

In their reply brief, Defendants argue that "[t]here is no evidence [they] deliberately sought to deprive Plaintiff of the equal protection of the laws for reasons of a personal nature unrelated to the duties of their positions."  Doc. No. 35, at 6. The Court agrees.  Therefore, Plaintiff cannot make out a "class of one" equal protection claim on the facts of this case.

The Court first observes that both Plaintiff and his father admitted that they had no reason to believe that the Delhi Township Police Department had developed any ill will or malice toward Plaintiff or his family before the night of September 1, 2007.  Plaint. Dep. at 25; Slusher Dep. at 10.  Thus, Plaintiff's "class of one" claim arguably fails on the basis of those admissions alone.

In any event, although Plaintiff characterized the

officers' behavior as rude and unprofessional, Plaint. Dep. at 68, 74, there is scant evidence that any of the officers bore any animosity at all towards Plaintiff.  The record is clear, however, that to the extent that there is any evidence of animus, it arose in the context of the officer's official interactions with Plaintiff and, therefore, is not actionable under the standard just enunciated.  The best evidence of animus is Officer Supe's official report of the car theft in which he, <u>inter alia</u>, suggests that Plaintiff may have played a role in the theft of his own car, was in possession of stolen property, and associated with known criminals.  Nevertheless, however erroneous, conclusory, and unsupported Supe's conclusions may have been, they arose in the context of and were related to his official duties and thus do not constitute evidence of illegitimate animus for a "class of one."

Additionally, and perhaps more importantly, to the extent the report exhibits animus towards Plaintiff, the record establishes that Officer Supe's alleged animus could not have played any part in the manner in which the officers' handled the investigation into the events of the night in question.  The auto theft occurred <u>after</u> the assault and therefore Supe naturally generated his auto theft report after the assault.  Thus, setting aside the crucial fact that Weldele, not Supe, decided how to proceed with the assault complaint - it is impossible that Supe's

postfactum theories about the auto theft could have affected the manner in which the assault investigation unfolded. Although Plaintiff argues that Supe's report biased the manner in which Roberts investigated the auto theft, there is no support for that conclusion. Roberts in fact promptly investigated the auto theft complaint and it was Plaintiff and/or his parents who failed to follow-up with Roberts to provide the information he needed to proceed further. Plaintiff clearly believes it is untrue that he refused to cooperate with Roberts and that, therefore, the stated basis for closing the case was untrue. Roberts however, left the case open for six weeks and his conclusion that Plaintiff was not cooperating with the investigation was not unreasonable, even if erroneous, given Plaintiff's admitted failure to return his calls. Plaint. Dep. at 86-87.

A reasonable person could review this record and come away convinced that the Delhi Township Police Department and its officers mishandled both of these investigations and perhaps even treated Plaintiff unfairly. No reasonable person, however, could read this record and conclude that the Defendants' actions were motivated by personal animus toward Plaintiff, unrelated to their job duties. Consequently, no constitutional violation is established on this record because Plaintiff was not denied equal protection as a "class of one."

Accordingly, Defendants' motion for summary judgment on

Plaintiff's "class of one" equal protection claim is well-taken and is **GRANTED.**  This claim is **DISMISSED WITH PREJUDICE.**

## B. False Arrest

Plaintiff also claims that Defendants lacked probable cause to arrest or cite him for disorderly conduct.  A warrantless arrest is justified if, at the time of the defendant's arrest, police officers have probable cause to believe that an offense has been, is being, or will be committed.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  Probable cause exists where the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  The probable cause requirement does "not demand any showing that such a belief is correct or more likely true than false."  Texas v. Brown, 460 U.S. 730, 742 (1983).  Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983); see also United States v. Cortez, 449 U.S. 411, 418 (1981) ("The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are

20

law enforcement officers."); <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949). Thus, in determining whether probable cause exists, the trial court must look to the "totality of the circumstances," <u>Gates</u>, 462 U.S. at 230-31, and view the facts as a whole and in a practical manner." <u>United States v. Pepple</u>, 707 F.2d 261, 263 (6th Cir. 1983).

Officer Supe cited Plaintiff for disorderly conduct pursuant to Ohio Rev. Code § 2917.11(A)(1) for "engaging in violent or turbulent behavior," "to wit, cursing and yelling, causing alarm and annoyance to others." Doc. No. 30-3, at 7. Under Ohio law, "turbulent behavior" means "tumultuous behavior or unruly conduct characterized by violent disturbance or commotion." <u>State v. Reeder</u>, 479 N.E.2d 280, 282 (Ohio 1985). According to <u>State v. Jackson</u>, No. 17128, 1998 WL 801367, at *3 (Ohio Ct. App. Nov. 20, 1998), "[o]ne may be found to have engaged in turbulent behavior pursuant to R.C. 2917.11(A)(1) based upon the loudness or aggressiveness of the speech, rather than its content."

There clearly are issues of material fact concerning Plaintiff's behavior at the time he was cited for disorderly conduct.[3] While Plaintiff admits that he said, "This is

_____

[3] In their reply brief, citing to, <u>inter alia</u>, <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984), Defendants argue that Plaintiff's brief detention, citation, and release was not an arrest which required probable cause. <u>Berkemer</u> does not apply here, however, because that case considered whether an officer was required to give a <u>Miranda</u> warning while detaining a motorist

bullshit" to the police officers, he denies that he was yelling
and shouting and waving or flailing his arms as the police
officers testified.  Plaint. Dep. at 63.  On the present motion
for summary judgment, the Court of course is bound to accept
Plaintiff's version of the event.  Accordingly, the question is
whether the police officers had probable cause to cite Plaintiff
for disorderly conduct merely for saying "This is bullshit"
without raising his voice or gesturing at the officers.  In
Thacker v. Lawrence County, 182 Fed. Appx. 464 (6th Cir. 2006),
the Court held that sheriff's deputies had probable cause to
arrest the plaintiff for disorderly conduct pursuant to §
2917.11(A)(1) where he swore loudly at the deputies and did not
calm down when requested to do so.  Id. at 470.  In Abdul-Khaliq
v. City of Newark, 275 Fed. Appx. 517 (6th Cir. 2008), the Court
noted that "[u]nder Ohio law, vulgar language accompanied by
aggressive behavior can be sufficient to support a disorderly

---

during a traffic stop.  Under the facts, the Court held that the
motorist was not "in custody" during the detention for purposes
of Miranda until he was formally arrested.  Id. at 442.  In this
case, however, Plaintiff was handcuffed and placed in the patrol
car for a brief period.  Therefore, even if Plaintiff was not
formally arrested, he was seized by the police and handcuffing
him and placing him in the patrol car could be unreasonable if
there was no risk of flight or no reasonable apprehension for
officer safety.  See Bennett v. City of Eastpointe, 410 F.3d 810,
836-40 (6th Cir. 2005).  Therefore, whether or not Plaintiff was
actually formally arrested, he clearly was seized and, therefore,
a Fourth Amendment question remains to be resolved.  The parties,
however, have framed the issue as one of probable cause to be
arrested for disorderly conduct and the Court confines itself to
those parameters.

conduct conviction based on 'turbulent behavior.'" Id. at 521.
In this case, while Plaintiff admittedly swore at the officers,
he claims he did not raise his voice or otherwise engage in
aggressive behavior towards the officers. Thus, both Thacker and
Abdul-Khaliq indicate that the officers lacked probable cause to
cite Plaintiff for disorderly conduct merely for swearing at
them. Additionally, the court in State v. Robison, 614 N.E.2d
1109 (Ohio Ct. App. 1992), observed that "under most
circumstances, cursing at an officer does not in and of itself
constitute disorderly conduct unless it was a situation where
appellant's language was likely to incite violence or encourage
disobedience to legitimate police orders." Id. at 1111.
Accordingly, since the record in this case, viewed in Plaintiff's
favor, established that Plaintiff only used profanity in the
police officer's presence, without raising his voice and without
engaging in any aggressive behavior towards them, they lacked
probable cause to arrest and cite him for disorderly conduct.

### 1. Qualified Immunity

Having determined that the record for purposes of
summary judgment establishes that the police officers lacked
probable cause to arrest or cite Plaintiff for disorderly
conduct, the question becomes whether the officers are entitled
to qualified immunity from suit for this act.

A public official is entitled to qualified immunity,

and thus shielded from suit under § 1983, for his actions if his
conduct does not violate a clearly established statutory or
constitutional right of which a reasonable official would have
known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The
contours of the right must be sufficiently clear that a
reasonable official would understand that what he was doing
violates that right. Anderson v. Creighton, 483 U.S. 635, 640
(1987). The official, however, is only entitled to qualified
immunity for actions taken in objective good faith within the
scope of his duties. Id. at 849 fn.34.

Determining a public official's entitlement to
qualified immunity presents a two-step inquiry. First, the court
must determine, judged in the light most favorable to the party
asserting the injury, whether the facts alleged show that the
officer's conduct violated a constitutional right. Saucier v.
Katz, 533 U.S. 194, 201 (2001). If no constitutional right would
have been violated on the facts alleged, the inquiry stops and
the officer will be entitled to qualified immunity. Id. If a
violation can be made out based on a favorable view of the
pleadings, the court must determine whether the right at stake
was clearly established. Id.

In determining whether a constitutional right is
clearly established, the court must first look to decisions of
the U.S. Supreme Court, then to decisions of the Sixth Circuit,

and, finally, to decisions of other circuits. <u>Walton v. City of</u>
<u>Southfield</u>, 995 F.2d 1331, 1336 (6th Cir. 1993) (citing <u>Daugherty</u>
<u>v. Campbell</u>, 935 F.2d 780, 784 (6th Cir. 1991)). It is only the
extraordinary case that will require a reviewing court to look
beyond Supreme Court and Sixth Circuit decisions. <u>Id.</u> The
questions of whether the right alleged to have been violated is
clearly established and whether the official reasonably could
have believed that his conduct was consistent with the right the
plaintiff claims was violated, are ones of law for the court.
<u>Id.</u> However, if genuine issues of material fact exist as to
whether the official committed the acts that would violate a
clearly established right, then summary judgment is improper.
<u>Id.</u>; <u>see</u> <u>also</u> <u>Jackson v. Hoylman</u>, 933 F.2d 401, 403 (6th Cir.
1991) (affirming district court's denial of summary judgment on
the issue of qualified immunity where the parties' factual
account of the incident differed).

When a defendant raises qualified immunity as a
defense, as the Defendants have done in this case, Doc. No. 23,
at 8, the plaintiff bears the burden of demonstrating that the
defendant is not entitled to qualified immunity. <u>Everson v.</u>
<u>Leis</u>, 556 F.3d 484, 494 (6th Cir. 2009). In order to defeat a
claim of qualified immunity, the plaintiff must show both that
the right at issue was clearly established in that a reasonable
officer would have known that his conduct was unlawful in the

situation he confronted <u>and</u> proffer sufficient evidence that what the official allegedly did was unreasonable in light of the clearly established constitutional right. <u>Moldowan v. City of Warren</u>, ___ F.3d___, No. 05-70331, 2009 WL 1872284, slip op. at 20 (6th Cir. July 1, 2009). In this case, Plaintiff has completely omitted from his brief any discussion of or citation to cases clearly establishing that the officers' conduct in citing him for disorderly conduct was unlawful under the particular facts of this case. Moreover, Plaintiff has not proffered any record cites which tend to show that the officers' conduct was unreasonable in light of the clearly established right. Therefore, Plaintiff has failed to carry his burden of demonstrating the individual Defendants are not entitled to qualified immunity as to his claim that he was arrested without probable cause. Consequently, the individual defendants are entitled to qualified immunity on this claim.

Accordingly, Defendants' motion for summary judgment on Plaintiff's false arrest claims against the individual Defendants in their individual capacities is well-taken and is **GRANTED.**

## 2. <u>Municipal Liability</u>

Plaintiff also asserts his false arrest claim against Delhi Township. A municipality may only be held liable for a constitutional deprivation under § 1983 if the deprivation was the result of an official policy or custom. <u>Monell v. Department</u>

of Social Services, 436 U.S. 658, 690 (1978).  However, a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior.  Id. at 691.  Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell unless proof of the incident includes proof that it was caused by an existing, unconstitutional policy, which policy can be attributed to a policymaker.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  A policy is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing formal policy with respect to the subject matter in question.  Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).

Here, similar to the problem with the false arrest claims against the individual Defendants, Plaintiff has failed to identify any policy or custom of Delhi Township which resulted in the alleged unconstitutional arrest.  Accordingly, Defendants' motion for summary judgment on Plaintiff's false arrest claims against Delhi Township is well-taken and **GRANTED.**

C. Malicious Prosecution

Finally, Plaintiff asserts a state law claim against the Defendants for malicious prosecution.  However, having granted Defendants' motion for summary judgment on Plaintiff's federal claims, the Court declines to exercise supplemental

jurisdiction over the remaining state law claim.  See Hankins v. The Gap, Inc., 84 F.3d 797, 802-03 (6th Cir. 1996). Accordingly, Defendants' motion for summary judgment on this claim is **MOOT**; Plaintiff's malicious prosecution claim is **DISMISSED WITHOUT PREJUDICE.**

## Conclusion

In conclusion, and for the reasons stated, Defendants' motion for summary judgment on each of Plaintiff's claims arising under 42 U.S.C. § 1983 is well-taken and is **GRANTED**.  Plaintiff's federal constitutional claims are **DISMISSED WITH PREJUDICE**.  The Court declines to exercise supplemental jurisdiction over the remaining state law claim.  Accordingly, that claim is **DISMISSED WITHOUT PREJUDICE.**  Defendants' motion for summary judgment therefore is **MOOT** as to the state law claim.


**IT IS SO ORDERED**

Date July 14, 2009                    s/Sandra S. Beckwith
                                       Sandra S. Beckwith
                              Senior United States District Judge